STATE of Tennessee, Petitioner,

v.

Raymond CHANDLER and James Kenneth Dearing, Respondents.

Supreme Court of Tennessee.

March 14, 1977.

Brooks McLemore, Atty. Gen., Richard Lodge, Asst. Atty. Gen., Nashville, Alfred C. Schmutzer, Jr., Dist. Atty. Gen., Sevierville, for petitioner.

R. W. Brooks, Holt, Gilreath, & Brooks, Sevierville, Perry P. Paine, Jr., Felknor, Paine, Delozier & Cunningham, Maryville, for respondents.

## OPINION

FONES, Justice.

Defendants were indicted for larceny of four (4) heifers and concealing or aiding in concealing four (4) heifers. The jury found them guilty of the lesser charge and fixed their punishment at not less than three (3) nor more than (5) years.

The Court of Criminal Appeals reversed and remanded for a new trial. The plurality opinion found that defendants were apparently arrested illegally and subjected to a lengthy and apparently illegal incarceration and that statements made by defendants while so held were inadmissible under the dictates of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). One member of that Court, in a concurring opinion, agreed that defendants may have been detained improperly, did not agree that the arrest was illegal, but assuming that it was, expressed the view that the illegal arrest did not void the conviction. However, he concurred in the reversal. The other member of the panel dissented. We granted the State's petition for the writ of certiorari.

### I.

In *Brown v. Illinois, supra,* two officers who were investigating the murder of one Roger Corpus broke into Brown's apartment, searched it, remained there lying in wait, and arrested Brown when he appeared, without a warrant or probable cause. He denied being Richard Brown and during the twenty (20) minute drive to the police station he was questioned about his identity and ownership of a 1966 automo-

bile. He was taken to an interrogation room and given *Miranda* warnings. With the file before them the officers informed Brown that they knew of an incident that had occurred in a pool room when he, angry at being cheated at dice, fired a shot into the ceiling, that a bullet had been obtained from that ceiling and compared with bullets taken from Corpus' body. At 8:45 p. m., exactly one (1) hour after the arrest at Brown's apartment, he was asked whether he wanted to talk about the Corpus homicide. He responded in the affirmative and for the next twenty (20) to twenty-five (25) minutes he answered questions put to him by one of the officers while the other typed. The result was a two (2) page signed statement in which Brown acknowledged that he and one Claggett visited Corpus on the evening of the homicide and after a period of drinking and smoking marijuana, Claggett shot Corpus three (3) times through a pillow, using a .38 caliber revolver sold to him by Brown. At 9:30 p. m. the two officers, with Brown in custody, toured an area of Chicago searching for Claggett. After a stop at police headquarters to obtain a photograph of Claggett, he was observed crossing an intersection, arrested, and the four returned to the police station about 12:15 a. m. At 2:00 a. m. an assistant state attorney arrived, repeated *Miranda* warnings and obtained a second statement from Brown which was completed about 3:00 a. m. but Brown refused to sign it. At about 4:00 a. m. Brown made a telephone call to his mother and at 9:30 a. m. he was taken before a magistrate. The issue confronted was whether the statements were to be excluded as the fruit of the illegal arrest or were admissible because the giving of *Miranda* warnings sufficiently attenuated the taint of the arrest.

■ The Supreme Court analyzed the relationship between illegal arrests and subsequent confessions under the dictates of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). They reaffirmed that statements rendered under such conditions involve both Fourth and Fifth Amendment issues; that *Wong Sun* requires that the statement be "sufficiently an act of free will to purge the primary taint" in addition to meeting the Fifth Amendment standard of voluntariness. Preliminary to establishing a three prong test, in addition to the *Miranda* warnings, the Court said:

"The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered." 95 S.Ct. at 2261.

The additional factors are:

(1) The length of time between the arrest and the time the confession was made;

(2) The presence of intervening events between the arrest and confession, such as arraignment;

(3) The purpose and flagrancy of the official misconduct.

The burden is on the prosecution to establish admissibility. The Supreme Court's conclusion and disposition of *Brown* is significant:

"The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.

We emphasize that our holding is a limited one. We decide only that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." 95 S.Ct. at 2262, 2263.

## II.

The issues in this case are the admissibility of an incident involving defendant Dearing and an incident involving defendant Chandler. It would be inaccurate to characterize either incident as a confession. Neither occurred as the result of the usual and ordinary type of interrogation.

Before discussing the incidents at issue, the testimony with respect to the crime should be related. On the day of the trial, pursuant to motion, a severance was granted co-defendant Loveday and he testified for the State. In substance he related that Chandler knew of the Allen Farm and the three of them looked it over one night prior to the theft of the cattle; that on a Wednesday night preceding the Saturday on which they were arrested a, U–Haul truck was obtained, they returned to the Allen Farm, drove four (4) heifers into the barn, through the loading shoot and into the U–Haul; that they parted company with Dearing later, as he was the one designated to sell the cattle; that on Thursday Dearing told him that he had sold the cattle for two hundred ($200) dollars and that he, Loveday, received his share, forty ($40) dollars, on Friday.

Chandler did not testify. Dearing testified that late on the Wednesday night of the theft, Loveday approached him at Dudley Hodge's Place on Chapman Highway in Knox County and wanted to borrow a truck to move a deep freeze and a refrigerator; that he got a U–Haul truck from Clemmer's Texaco and turned it over to Charles Loveday and his father Pink Loveday about midnight; that between 1:30 a. m. and 2:30 a. m. they returned to Dudley Hodge's Place with four (4) cattle and asked if he knew where he could sell them. He said he thought so and that he sold them to Glen Fraker for five hundred ($500) dollars. He denied that he had ever been to the Allen Farm and said that he did not know where it was.

Glen Fraker testified that he bought four (4) cattle from Dearing about 5:00 a. m. or 6:00 a. m. Thursday morning; that Dearing brought them to his place in a yellow moving van and he paid five hundred ($500) dollars by check; that someone called him and said the check was not good and he met Dearing at the bank and "was with him when he cashed it." The cancelled check, dated August 29, 1974, payable to and endorsed by Dearing was made an exhibit. He told of two occasions when officers came by to inquire whether or not he had recently bought cattle. He asked if they could identify the cattle—they could not, but, " . . . when they names over the name I knowed I had the four cattle. I pointed them out." The record fails to reveal the date or time of the two visits.

Mrs. Allen testified and affirmed all remaining necessary elements of the crime.

On August 31, 1974, Sheriff Townsend arrested Charles Loveday and defendant Dearing and directed Officer James Segal to arrest defendant Chandler. The three (3) defendants were brought to the jail in Sevierville, promptly given *Miranda* warnings and executed written acknowledgements thereof. This occurred at 3:43 p. m. on Saturday. Testifying out of the presence of the jury, the Sheriff admitted that the arrests were made without warrants on charges of investigation of larceny of cattle; that the trial justice court was not open on Saturday but that defendants were formally charged and bond set on Tuesday, September 3, 1974, before Dearing agreed to show them where he took the cattle; that on Saturday he interrogated Dearing very briefly on two (2) occasions; that Dearing said he did not, " . . . know anything about it, and he wanted to know what the other fellows said; " that he was busy the next two days running down leads and did not see Dearing again until Tuesday on the trip to Fraker's; that Loveday had told him where they "loaded" the cattle and where Dearing had let him out—at the Dempster Dumpster at Claxton School—on the way to sell the cattle—and implicitly but not explicitly, that they had discovered where and to whom Dearing had sold the cattle; that on Tuesday afternoon he sent

Detective Kirby, " . . . up to the jail to ask him if he wanted to go show us the cattle, where he sold the cattle?" Detective Kirby testified that upon posing that question, Dearing said "Sure" and freely and willingly accompanied the three officers to Fraker's in Anderson County; that on the way Dearing commented on letting Loveday and Chandler out at the dumpster at Claxton School and requested that he be allowed to remain in the car out of Fraker's sight for the stated reason that he did not want to confront his friend.

The admissibility of these events initiated by Detective Kirby's single question was strongly resisted by counsel for Dearing. At a hearing out of the presence of the jury it was insisted that the arrest was without a warrant, the time of detention exceeded legal bounds, and that frequent and repeated interrogations occurred without any renewal of *Miranda* warnings.

The Sheriff further testified, under interrogation by the trial judge, that neither defendant said that he wished to remain silent or that they wanted a lawyer, or could not afford a lawyer and wanted one appointed; that they did not ask to be taken before a magistrate, be charged or dismissed, or have bond fixed; that they were allowed to make "their phone call" and that they did so. The Sheriff emphatically denied that any constant or repeated interrogation occurred during the three (3) day confinement over Labor Day Weekend.

Neither Dearing nor Chandler testified at the admissibility hearing and thus the State's evidence stands completely uncontradicted.

The incident involving Chandler was related by Officer Segal who testified that Chandler was limping and on Sunday the following occurred:

"A. . . . So then on the following . . I still didn't ask him no questions the first day only just conversation, the next day, on Sunday, when I talked to him, uh I told him, you know some of the other things that compiled more information, and I said I'm not asking you for any statements, I'm just telling you about these things. So I told him about the cow kicking him on the leg, and he laughed, and he said, Man you got it. He said that's right!

.    .    .    .    .

Q. What did his leg look like where the cow kicked him?

A. It was . . it looked like about a half-moon circle on his . . right beside of his leg bone, and was maybe on the edge of the bone, in between his ankle and his knee.

Q. was he bruised?

A. Yes it was."

### III.

■ The record is silent as to the facts known to the Sheriff and his officers at the time of the arrests, without warrants, on Saturday, August 31, and being unable to pass on the question of probable cause, we must assume the arrests were illegal.

This case was tried on November 11, 1974. *Brown v. Illinois, supra* was decided June 26, 1975. The basic principles underlying admissibility of evidence tainted by an illegal arrest were well established in *Wong Sun*, but not the three prong test first enunciated in *Brown*.

The trial judge afforded defendants full opportunity of cross examination of the Sheriff and Detective Kirby and to present any proof they desired in support of the inadmissibility of said incidents. As stated, neither defendant testified, during the jury-out hearing. Dearing denied, in his testimony before the jury that he had at any time admitted participation in the theft of the cattle, but did not refute the Tuesday afternoon question of Detective Kirby, his answer or any event that occurred during the trip to the Fraker farm.

■ The trial judge expressly found that the actions of defendants, whether they be designated statements, declarations against interests, or confessions, were freely, volun-

tarily and knowledgeably given and that there existed no coercion, intimidation or force in any degree. Under settled principles, his determination in binding upon the appellate courts if there is any evidence to support it. *Monts v. State*, 218 Tenn. 31, 400 S.W.2d 722 (1966); *Braziel v. State*, 529 S.W.2d 501, (Tenn.Cr.App.1975).

■ Thus the illegal arrest and the detention from midafternoon on Saturday, over the Labor Day weekend stand alone to taint the admissibility of the two incidents in question. The casual impromptu and spontaneous circumstances under which they occurred purges the taint of the illegal arrests and detention. Unlike *Brown*, there is nothing to indicate, in design or execution, a motivation on the part of the Sevier County officers to surprise, frighten or confuse or coerce defendants.

In *Wong Sun*, the Supreme Court said: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 83 S.Ct. at 417.

The record in this case negates finding that the evidence in question was obtained by exploitation of the illegality. In our opinion, the responses and actions of Dearing and Chandler were acts of free will, unaffected by and purged of initial illegality.

## IV.

We are in complete accord with the statement of the intermediate court that, "arrests should be made only when legal and incarceration carried out only with legal sanction." We are as reluctant to decide any case in a manner that might diminish the force of that admonition as was the Court of Criminal Appeals to reverse these convictions where admittedly there was substantial evidence of guilt. The Courts of Tennessee must abide the dictates of *Brown* and *Wong Sun*. These convictions were unduly jeopardized by the failure to obtain warrants prior to arrest, or to prove the existence of probable cause and the failure to promptly take defendants before a magistrate.

The judgment of the Court of Criminal Appeals is reversed and the convictions of Dearing and Chandler are affirmed.

COOPER, C. J., and BROCK and HARBISON, JJ., concur.

HENRY, J., dissents.

HENRY, Justice, dissenting.

I respectfully dissent.

The facts in this case are not in dispute, and are ably summarized in the majority opinion. However, I must differ from the majority's view of the application to the situation presented here of the standards articulated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

Both *Wong Sun* and *Brown* addressed the question of under what circumstances an illegal arrest would taint a subsequent confession, and render that confession inadmissible. *Wong Sun* answered that question in terms of a standard of free will somewhat higher than the traditional standard of voluntariness. The vagueness of that standard led to some confusion, which the Supreme Court attempted to eliminate in *Brown*.

Under *Brown*, a confession obtained subsequent to an illegal arrest must satisfy the following criteria to be admissible. First, it must pass the "threshold requirement" of voluntariness, 422 U.S. at 604, 95 S.Ct. 2254, required of all confessions under the Fifth Amendment. However, this is not sufficient. A confession may be voluntary un-

der the Fifth Amendment, and yet be tainted by the prior violation of the defendant's Fourth Amendment rights. The question becomes, in the language of the Court, under what circumstances can that taint be purged, rendering the confession admissible. It is to determine the answer to this question that the factors set out by the Court in *Brown* are to be considered:

1) whether Miranda warnings were given
2) the temporal proximity of the arrest and the confession
3) the presence of any intervening circumstances
4) the purpose and flagrancy of the official misconduct.

No one factor provides a certain guide. One must balance the factors, and attempt to determine, in the final analysis, whether the illegal arrest was a proximate contributing cause of the confession.

When applying the rationale of *Brown* to the instant case, it must be remembered that the facts of the two cases are not precisely analogous. In *Brown*, the crucial issue was raised by an illegal arrest. Here, we must deal with the effects of both an illegal arrest and an illegal confinement. Thus, the factors that were deemed relevant in *Brown* are not necessarily so here. For instance, the Court in *Brown* noted that the amount of time between the illegal arrest and the subsequent confession was one criterion by which one might judge whether the taint had been purged. The greater that time, the more likely that the illegal arrest had a minimal effect on the subsequent confession. However, when one considers the effects of an illegal arrest in addition to those of an illegal confinement, it is apparent that this factor is placed on the other pan of the balance—the longer that confinement, the greater the chance that it to some extent served to induce the confession.

Thus, one cannot base a decision in this case on a consideration of precisely the same factors as were considered in *Brown*. However, the ultimate question to be answered is the same as that in both *Brown*

and *Wong Sun*: Is the causal connection between the illegal arrest and confinement and the subsequent statements sufficiently tenuous so that the illegal acts can be said not to have been a proximate contributing cause of the statements? I believe that it is not, and thus that the defendant's statements should not have been admitted at trial.

I am compelled to reach this conclusion by the very nature of the improper police procedure in this case. The defendants' statements were made after a prolonged period of illegal confinement. Even if it is granted that the police committed no coercive acts, the defendants were subjected to "the compulsion inherent in custodial surroundings." *Miranda v. Arizona*, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694, 714 (1966). We need not determine whether the statements were obtained by the active "exploitation of the illegality" by the police. The mere fact of the illegal confinement was inherently coercive of the defendants' will.

This is not to say that an illegal arrest or confinement serves to taint any and all subsequent statements by a defendant. Later events, such as an arraignment or hearing, may sufficiently attenuate the effects of the prior illegal confinement so as to render any subsequent statements made by the defendant admissible.

However, on the facts of this case, that question does not present itself, and we need not deal with it here. The defendants' statements were made prior to their arraignment, and there were no events which even arguably mitigated the effects of their illegal confinement. I would hold any statements made in the course of that confinement inadmissible.

The foregoing is, I believe, more than sufficient cause to affirm the judgment rendered by the Court of Criminal Appeals. There is, however, a more compelling reason for doing so.

The majority is critical of the procedure employed by the police in this case, and

justifiably so. The actions complained of constitute a clear violation of the defendants' constitutional rights, as well as of the explicit command of T.C.A. Sec. 40–604. I agree with the majority that those actions are deserving of censure. I do not believe that mere censure is sufficient.

The issue presented here goes beyond the question of whether the statements obtained in the course of an illegal confinement were voluntary, or whether the taint of the improper procedure was purged. Those questions turn primarily on the detriment suffered by the defendant. Of greater import is the question of what effect the decision reached in this case will have on subsequent police procedure.

The exclusionary rule does not serve merely to minimize the injury suffered by a particular defendant as a result of illegal police procedure. "Its purpose is to deter— to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it". *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669, 1677 (1960). It is unfortunate that the courts have no better way to deter police conduct inconsistent with what we believe to be the standards necessary to a free society. In many cases, this may result in a windfall for the defendant. That is regrettable, but unavoidable. For us to do otherwise requires that we implicitly both sanction and encourage illegal acts by the police. "We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." *Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944, 953 (1928), (Holmes, J., dissenting).

To the extent that this decision serves to encourage acts by the police such as took place in this case, this Court plays such a part, and contributes, however slightly, to the erosion of those freedoms we are sworn to protect.

I will not be party to it.

I would affirm.