Eddie SCHARFF, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

May 2, 1977.

Walter C. Kurtz, Knoxville, for petitioner.

Brooks McLemore, Jr., Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, for respondent.

## OPINION

FONES, Justice.

We granted certiorari in this case because of the pending question of the constitutionality of the death penalty statute and to further consider the admissibility of certain statements obtained from defendant. We will also address, to the extent the record permits, the status of our statutes granting women the option to serve or not when summoned to jury duty.

The jury found the defendant guilty of murder in the first degree and fixed his punishment at death by electrocution. The Court of Criminal Appeals affirmed all aspects of the trial court verdict, although one member dissented on the majority's handling of the issue of discriminatory composition of the jury. On February 9, 1977, the Governor commuted defendant's sentence to life imprisonment.

The victim of this brutal murder was an eighteen (18) year old female. She was last seen alive by her parents on October 22, 1974, in the accompaniment of defendant and one Donnie Moore.

On October 24, 1974, defendant voluntarily called Knox County Deputy Sheriff Riggs to relate the circumstances of the whereabouts of the victim. Riggs testified that the defendant claimed that he, Moore and two individuals named Mingle and Carmen were all sniffing paint with the victim in an area near the Holston River. All participants in this activity were at one

time in defendant's car. Defendant claimed that while he and Moore were in the back seat of his car sniffing paint the other two men grabbed the victim, took her outside and began beating her severely. He stated that he thought the victim had run away and knew nothing more about her whereabouts. Defendant then led Riggs to the site of the incident. On October 25, Officer Riggs, with helicopter assistance located the victim's body in the Holston River.

On that same day warrants were obtained but not served on defendant and all others he had been with on the night of the murder. Defendant actually assisted officers in the apprehension of the others and was taken into custody solely to protect his informant status. A consent to search defendant's car was also obtained from defendant.

After interrogating Moore and his wife, officers began to suspect defendant was lying. Sometime on October 26, defendant became a suspect and was advised of his rights. He waived counsel and agreed to cooperate. He was repeatedly questioned throughout the day and evening of the 26th until approximately 2:30 a. m. on the 27th when he was returned to his cell. During the time he gave several different accounts of what occurred but none inculpatory.

Sometime during the late morning hours of the 27th, defendant began to act as if intoxicated. Although obviously under the influence of something, a waiver of presentment was obtained from defendant by an assistant district attorney general. However, no questioning of the accused was conducted on the 27th after it became obvious he was under the influence of drugs.

On the 28th, the defendant appeared normal to officers, was readvised of his rights and executed a waiver. At that time a handwritten statement was obtained from defendant in which he admitted being alone with the victim, sniffing paint on the evening of the 22nd when he passed out. He said he awoke and found the victim on the ground and then became alarmed and put her in the trunk of his car. He stated he

drove around with her body and finally dragged her from the trunk of his car and dropped her into the Holston River. He did not admit killing the victim.

Subsequent to this confession on the 28th, defendant was arraigned before a general sessions judge. The general sessions judge was called to testify for the prosecution and stated that at the time of arraignment defendant appeared coherent and understood his rights.

The search of defendant's car produced a lug wrench with unidentifiable blood stains on it. A vacuum of the contents of the trunk of defendant's automobile also produced hair samples which matched the victim's. A substantial amount of other scientific evidence was also introduced at trial which linked defendant with the crime.

A pathologist testified that the cause of death was approximately thirty (30) heavy blows to the victim's head from a smooth blunt instrument. In this testimony the State, over defense objection, introduced several slides of the victim's head to show the multiplicity of the blows. The pathologist testified that the lug wrench taken from defendant's car could easily have been the murder weapon.

Donnie Moore testified at trial that he had been with the defendant and victim the night of the murder. All three (3) had gone to his apartment to sniff paint. Sometime during the evening defendant stated that he and the victim wished to be alone and left. The next day defendant returned to Moore's apartment and showed Moore the victim's body in his trunk, stating, "I killed her." After Moore refused to help with the disposal of the victim's body defendant left.

Defendant's testimony at trial was somewhat different from any of his other statements. He denied being alone with the victim and laid the responsibility of her death on two different individuals named Caylor and Peacock. He said that those men murdered the victim because they believed that she was a drug informant. He denied knowledge of his confession made on October 28.

### I.

Defendant contests the admission of any statements characterized as "inculpatory" or "made against his interest" which were obtained on either October 25, 26, or 27, as well as the handwritten, later typewritten statement of October 28. He alleges these statements were made while he was incapacitated and were, as well, the products of an illegal arrest.

Our review of the record reflects that only the statement of October 28 was ever utilized by the prosecution. Furthermore, although reference was made to other statements in cross-examination of the defendant and in the testimony in the motion to suppress, none were ever introduced into evidence for any purpose nor were any shown to be inculpating. Consequently, our review is limited to the statement made on October 28.

■ Both the trial judge and the Court of Criminal Appeals held the statement rendered on October 28 to have been freely and voluntarily given and specifically found that defendant was not laboring under the influence of drugs at the time. Such concurrent findings are all but conclusive if there is any evidence to support them. *State v. Chandler [and Dearing]*, 547 S.W.2d 918 (Tenn.1977); *Monts v. State*, 218 Tenn. 31, 400 S.W.2d 722 (1966). We find the testimony of the general sessions judge as well as the testimony of the police officers that defendant was coherent on the 28th constitutes sufficient evidence that defendant was free from any drug influence at the time the statement was taken.

Defendant also contends that the statement of the 28th was as a consequence and a direct product of the illegal apprehension occurring on the 25th of October. Neither the trial court nor the Court of Criminal Appeals specifically dealt with this issue. In *State v. Chandler [and Dearing], supra*, we delineated the factors that the United States Supreme Court set forth in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), that must be considered in the review of statements taken pursuant to an *illegal arrest*. See 547 S.W.2d at 922.

However, there is no need for such review where there was no illegal arrest.

■ In the present case the testimony demonstrates that the initial apprehension of defendant was with his own consent and for his own protection. He actually assisted officers by gathering those he said participated in the murder at a single location. Throughout the 25th the accused was actually in "protective custody." Although on the 26th, defendant became the prime suspect, it was only after officers had interrogated other individuals who had been informed on by defendant and had searched his automobile. From these interrogations and investigations reasonable cause was established in the eyes of the officers and district attorney general to believe that defendant was actually their murderer. Only at this time did defendant actually enter into an "arrest status." The fortuitous circumstance that he was already in police custody does not change what was otherwise a valid arrest under T.C.A. § 40–803(3).

■ Under this assignment of error defendant also contends that the October 28 statement was inadmissible because the police should have known that defendant was at that time represented by counsel in a burglary case and should not have been interrogated without contacting said attorney. This argument is untenable in the face of defendant's voluntarily signed waivers of his right to have a lawyer present.

We specifically find that the statement given on October 28 and introduced into evidence by the prosecution was valid, and freely and voluntarily given.

### II.

Defendant assigns as error the failure of the trial judge to sustain his plea in abatement to the indictment. Relying upon *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), defendant asserts that optional jury duty granted to women in T.C.A. § 22–101 is unconstitutional upon its face.

The Louisiana law under examination in *Taylor* provided that no woman would be called for jury service unless she had previously filed with the clerk a written declaration of her desire to serve. *Taylor* did not find that exemption facially unconstitutional. The record in *Taylor* revealed, factually, by proof and stipulation, that in the judicial district where defendant was tried fifty-three (53%) percent of the persons eligible for jury duty were female; that in one of the two parishes of that district no more than ten (10%) percent of the persons on the jury wheel were women; that from December 8, 1971, to November 2, 1972, of one thousand eight hundred (1,800) persons drawn to fill petit jury venires only twelve (12) were women and no women were among the one hundred seventy-five (175) persons drawn for jury service during the term that *Taylor* was tried.

The Court reviewed its prior relevant decisions and concluded that, "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 95 S.Ct. at 697.

After discussion of the reasons historically given for excluding women from jury service and the recent demise of those reasons the court concluded:

" . . . we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male. . . .

Our holding does not augur or authorize the fashioning of detailed jury selection codes by federal courts. The fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community. . . . But, as we have said, Louisiana's special exemption for women operates to exclude them from petit juries, which in our view is contrary to the command of the Sixth

and Fourteenth Amendments." 95 S.Ct. at 701, 702.

As we read the opinion, the exemption statute is unconstitutional only if the consequence is, or if it operates, to produce criminal jury venires that are almost totally male.

This record contains no facts reflecting the consequence of the operation of T.C.A. § 22–101 and § 22–108 in Knox County. The list of names of the petit jurors indicate that three (3) were probably women.

The Court of Criminal Appeals disposed of this assignment of error with the statement that the Court had previously held the statutes relating to women jurors to be constitutional, citing two (2) unreported decisions, *Joe Ivory McKinney v. State*, released at Jackson, November, 1975, and *Alvin Gene Schwartz v. State*, released at Knoxville, September, 1976. The dissent in this case calls attention to a third unreported case of the Court of Criminal Appeals, *Robert D. Christopher v. State*, released in Knoxville, March 23, 1976. In *Alvin Gene Schwartz* and *Robert D. Christopher*, the Court of Criminal Appeals interpreted T.C.A. §§ 22–101 and 22–108 as follows:

"T.C.A. § 22–101 sets forth the basic qualifications for jurors. The defendant complains of the provision in that section which provides, 'A woman *shall* have the option of serving or not when summoned to jury duty.' (emphasis added). In answering this assignment, it is necessary for the provisions of T.C.A. § 22–101 to be read in conjunction with the provisions of T.C.A. § 22–108, which provides:

'Any woman may, when summoned by an officer or otherwise, at that time state to said officer or notify the court by mail, that said woman does not desire to serve and she *may* thereby be excused from such service.' (emphasis added).

Thus, we readily see that these two Tennessee statutes do not systematically exclude women from serving as jurors. While T.C.A. § 22–101 says she *shall* have an option of serving or not, T.C.A. § 22–108 erodes this option by saying she *may*

be excused. We interpret these sections to mean that the excusing of a prospective woman juror is a matter for the discretion of the trial court."

With the possible exception of *Robert D. Christopher*, the record in each of the three (3) unreported decisions of the Court of Criminal Appeals was devoid of the necessary evidence to enable a decision on the merits of the constitutionality of statutes exempting women jurors, applying the principles enunciated in *Taylor*. It is regrettable that the record in this case does not permit a decision on the merits. Nevertheless, we deem it necessary to express our disagreement with the Court of Criminal Appeals' interpretation of the women juror exemption statutes.

T.C.A. § 22–108 clearly evinces the purpose of providing methods of claiming the exemption that do not require women to make a personal appearance at the courthouse. The use of the word "may" in the latter section does not dilute the imperative "shall" in the earlier section. In our opinion, trial judges have no discretion whatsoever and must honor the claim of any woman, to exemption from jury service.

We are acutely aware that a continuing invitation to appellate review is presented by the unresolved status of woman jurors.

The constitutionality of these statutes, while highly suspect from the single fact that 51.3% of the nation's population are women, cannot be tested pursuant to the principles announced in *Taylor* until a record is presented that reflects the consequences of their operation, rather than attempts to circumvent their mandatory application.

### III.

We affirm the Court of Criminal Appeals' disposition of all remaining issues urged by defendant.

In the cases of *Clarence L. Collins v. State*, and *State v. Frank Carl Morgan*, released on January 24, 1977, we have held that the statutory provisions for mandatory death sentences, T.C.A. §§ 39–2405—2406 are unconstitutional under decisions of the Supreme Court of the United States therein referred to and discussed.

We have considered the validity and effect of the Governor's commutation of a death sentence to life imprisonment, in circumstances similar to those of this case, in our Opinions on Petition to Rehear in *Collins* and *Morgan*, to be released on the same date as this Opinion. For the reasons stated therein, the majority of the Court is of the opinion that the commutation is valid and has the same legal effect as though it had originally been pronounced for the commuted term.

The result is that the judgment of the trial court, as commuted to life imprisonment, is affirmed.

I am authorized to state that Chief Justice COOPER and Justice BROCK concur except for that portion of this opinion that affirms the sentence of the trial court as commuted by the Governor to life imprisonment for the reasons stated in their dissent in *Collins* and *Morgan*.

HARBISON, J., concurs.

HENRY, Justice, concurring.

The time has come for us to stop whispering and whistling about the constitutionality of Sections 22–101 and 22–108, T.C.A., and to say flat-footedly that these Code provisions are unconstitutional.

At least four times this insistence has been made in the Court of Criminal Appeals. Each time we could not reach the issue on certiorari. It is apparent that this has become one of those issues of overriding, recurring, and substantial importance demanding resolution but evading review. *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

What we say might be dictum but it would be so demonstrably clear that to denounce it as dictum would be a study in futility.

I am impressed with the dissenting opinion of Judge Daughtrey in this case. I particularly applaud these comments:

. . . . I am persuaded that T.C.A. §§ 22–101 and 22–108 are facially unconstitutional. The legislature in determining the qualifications for jury service has provided unequivocally in T.C.A. § 22–101 that a woman "shall have the option of serving or not when summoned to jury duty.[1] Under § 22–108 a woman choosing to exercise her option not to serve is merely relieved of the responsibility of appearing in Court in response to the summons:

> Any woman may, when summoned by an officer or otherwise, at that time state to said officer or notify the court by mail, that said woman does not desire to serve and she may thereby be excused from such service.

By use of the term "may" the legislature obviously meant that excuse by a summonsing officer or through the mail are not a woman's exclusive means of declining service; presumably she may also come to court after a summons has been executed and invoke her unqualified option not to serve under T.C.A. § 22–101. I therefore think it is clear that a woman in Tennessee may decline jury service for no reason other than her sex, and that upon request her option *must* be honored by the trial court, although it *may* also be granted by a court officer or after notice by mail.

Any woman can decline jury service; therefore, as Judge Daughtrey points out, all women can.

These, and all other statutes, that single out women for preferential treatment by relieving them from the duties and obligations of citizenship are as offensive as those that abridge their rights and privileges as citizens. These statutes are a throwback to the now wholly discredited belief that "a woman's place is in the home". This is but a subtle form of antifeminism under which women are denied a portion of their rights as citizens.

I am persuaded that all gender-based classifications are constitutionally infirm. Irrespective of the time frame of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and independent of that case, I would hold that they violate the provisions of Art. 11, Sec. 8 of the Constitution of Tennessee.

And I would hold it *now*.

---

[1]. Male citizens, if qualified under § 22 101 (requiring a minimum age of 21 years, United States citizenship, Tennessee residency, and durational residency of 12 months in the county of service) and not disqualified under § 22–105 (by reasons of interest in the case or relationship to the parties) nor incompetent under § 22–102 (because infamous or mentally or physically incompetent), must serve unless excused under § 22–103 (by reason of occupation) or under § 22–104 (for "hardship").