IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2006

## STATE OF TENNESSEE v. VERNITA FREEMAN

**Appeal from the Criminal Court for Shelby County**
**No. 02-05610     John P. Colton, Jr., Judge**

———————————

**No. W2005-02904-CCA-R3-CD - Filed February 6, 2007**

———————————

The Appellant, Vernita Freeman, was found guilty by a Shelby County jury of first degree felony murder in the perpetration of aggravated child abuse, aggravated child abuse, and aggravated child neglect of her eleven-month-old daughter. For these convictions, Freeman received concurrent sentences resulting in an effective sentence of life imprisonment. On appeal, Freeman contends: (1) that the trial court erred in denying her motion to suppress her statement to the police; and (2) that the evidence is insufficient to support her convictions. Within her sufficiency argument, Freeman also contends that her dual convictions for aggravated child abuse and aggravated child neglect violate double jeopardy protections. After review, we conclude that Freeman's suppression issue is without merit. Furthermore, we conclude that the evidence is legally sufficient to support her convictions of first degree felony murder and aggravated child abuse. Accordingly, those convictions are affirmed. We conclude, however, that the evidence is insufficient to support her conviction for aggravated child neglect. As such, this judgment of conviction is vacated and dismissed, and the case is remanded for entry of a corrected judgment form to reflect this holding for Department of Correction purposes.

**Tenn. R. App. P. 3; Convictions for First Degree Felony Murder and Aggravated Child**
**Abuse Affirmed; Aggravated Child Neglect Conviction Vacated and Dismissed; Remanded**
**for Entry of Corrected Judgment Form**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Garland Ergüden (on appeal); James Hale and Jane Sturdivant (at trial), Assistant Public Defenders, Memphis, Tennessee, for the Appellant, Vernita Freeman.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Kevin Rardin and Muriel Conner, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## Factual Background

On February 6, 2002, the twenty-three-year-old Appellant was living with her boyfriend, Derek Rawlings, and her eleven-month-old child, Keona Tyms. The Appellant and Rawlings had been living together for approximately five weeks following the Appellant's separation from Ralphiael Tyms, the father of Keona. The Appellant and Tyms had lived together for nine years. This long-term relationship was characterized as "horrible." Prior to the offense, the Appellant was regularly employed at the Waffle House as a cook.

Around 8:00 a.m. on the morning of February 7, 2002, the Appellant called 911 after observing that Keona was not breathing in her bed. Upon their arrival, a paramedics team found that the infant was deceased. The Appellant told the medical responders that Keona had been breathing properly when she put her to bed and when she checked on her around 10:00 p.m. the previous night; however, the Appellant also related that her daughter had developed a bad cold and cough which had persisted for several weeks. Later that morning, the Appellant was asked by police to go to the police department and provide information regarding the infant's death. The Appellant informed the investigating officers that she could not explain her daughter's death. She stated that she and Rawlings were the only persons in the house and that Keona was breathing normally when placed in her bed. She stated that she and Rawlings went to bed later, and she awoke around 2:00 a.m. when Rawlings left the house. The Appellant related that when she found her daughter not breathing around 8:00 a.m., she was the only person in the house.

After the police were informed by the medical examiner on February 8th of the victim's cause of death, the Appellant and Rawlings were asked to return to the police station. During the initial questioning, the Appellant maintained her innocence in the victim's death. Several hours later, however, after the Appellant was informed by the police that Rawlings had given a statement that the Appellant was responsible for her daughter's death, the Appellant confessed her involvement in the homicide.

The Appellant explained that the victim was crying because she wanted to be held. The Appellant stated that the victim would not stop crying, and "I picked her up and I shook her and I threw her on the couch . . . . The [victim] was still crying and I grabbed her and threw her in the bed." The Appellant stated bruises on the victim's head were present because her head hit the wall when she was thrown on the bed. The Appellant's statement was concluded at 1:00 a.m. on February 9, 2002.

At trial, the deputy medical examiner testified that the post-mortem examination revealed "multiple injuries, including blunt trauma to the head and shaken baby syndrome." The injuries were consistent with a child being violently shaken and then being thrown against a wall. The medical examiner listed the cause of death as "abusive head injury, due to abusive type injuries." The victim's time of death was estimated to be around 6:00 a.m. on February 7, 2002.

In July 2002, a Shelby County grand jury returned a three-count indictment against the Appellant for: (1) first degree felony murder in the perpetration of aggravated child abuse; (2) aggravated child abuse; and (3) aggravated child neglect. After a four-day jury trial, the Appellant was convicted as indicted. The Appellant testified in her own behalf at trial. She stated that someone had murdered her daughter but insisted she was not the guilty party. The Appellant testified that she loved her baby and would never harm her. She maintained that her admissions to the police were false, stating that she only gave the statement because she was scared and threatened. As a result of her conviction for first degree murder, the Appellant was sentenced to life imprisonment. Following a sentencing hearing, the Appellant received two concurrent twenty-year sentences for aggravated child abuse and aggravated child neglect. Additionally, these sentences were ordered to run concurrently to her sentence of life imprisonment. The Appellant's motion for new trial was denied, and this appeal followed.

**Analysis**

**I. Motion to Suppress Statement to the Police**

The Appellant contends that the trial court erred in failing to suppress her February 9, 2002 statement to the police because the statement was involuntarily given and, as such, violated "her due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, section 8 of the Tennessee Constitution."

The Appellant's involuntariness claim is two-fold. First, she argues that the waiver of her Fifth Amendment protections against self-incrimination was involuntary. Second, she contends that her statement was not freely and voluntarily given because police pressured her into making a false confession.

The findings of fact made by the trial court after an evidentiary hearing on a motion to suppress are afforded the weight of a jury verdict, and an appellate court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against the findings of the trial court. *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996). The trial court, as the trier of fact, is in the best position to assess the credibility of witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Id*. at 23. However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of law to the facts found by the trial court is a question of law that this court reviews *de novo*. *State v. Daniels*, 12 S.W.3d 420, 423 (Tenn. 2000).

**a.** *Miranda* **Waiver**

It is now fundamental that a prerequisite to the admissibility of a defendant's statement is that the statement must be voluntarily given by a defendant knowledgeable of his or her constitutional rights and accompanied by a valid and knowing waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn.

1992).  In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole.  *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

At the hearing on the motion to suppress, the Appellant conceded that a police officer had read her Fifth Amendment rights to her from a printed form before she gave the statement. Nonetheless, she argues that at the time she signed the waiver of rights form, she was unable to concentrate and didn't read the form before she signed it.  The Appellant admitted, however, that she was agreeable to talking to the officers.  Sergeant Ernestine Davison testified that she reviewed with the Appellant an "Interrogation Advice of Rights" form, a document which is routinely provided prior to the questioning of a person and which informs that person of his or her *Miranda* rights. Sergeant Davison testified that the Appellant signed the form acknowledging waiver of her rights.

Additionally, Sergeant Davison testified that she advised the Appellant "she could talk to us if she wanted to.  And she could stop talking at any time once she decided to talk, and if she wanted an attorney present she could have an attorney present with her."  Davison testified that the Appellant stated she understood her rights and wanted to talk to the officers.

With regard to the Appellant's assertion that the waiver of her Fifth Amendment rights was not valid, the trial court found as follows:

> [T]he [S]tate has what appears to be a valid written confession by the [Appellant]. This confession is accompanied by what appears to be a waiver of [the Appellant's] <u>Miranda</u> rights, signed, initialed and witnessed in such a manner as to appear valid and true . . . .  As such, the [Appellant] appears to have waived any rights she might have had under <u>Miranda</u> which would protect against self-incrimination, prior to making the confession. . . .

The proof at the hearing on the motion to suppress does not preponderate against the trial court's finding that the Appellant made a knowing and valid waiver of her *Miranda* rights.  Sergeant Davison testified that she advised the Appellant of her *Miranda* rights, and the Appellant signed a form indicating her choice to waive those rights prior to any questioning.  This testimony is consistent with the Appellant's testimony that she was amenable to discussing the events with the officers.

## b.  Voluntariness of Confession

Next, the Appellant argues that her statement was not freely and voluntarily given because the police pressured her into making a false confession.  She asserts these pressures included bullying, insults, threats, and being told that if she did not confess, she would be tried in front of an all-white jury and sentenced to death. The Appellant also stated she was coached by the officers with regard to the content of her statement and was told that she could get a lesser sentence if she stated she was hearing voices.

At the suppression hearing, the testimony of the State's witnesses materially contradicted the testimony of the Appellant. Sergeant Ernestine Davison and Lieutenant Queen McMahon testified that they were assigned to the homicide investigation of the victim and were the officers who questioned the Appellant, which began on February 8, 2002. Both officers testified that at no time was the Appellant ever threatened, coerced, or bullied, and that the Appellant freely and voluntarily admitted causing the victim's death. The officers explained that the interview took a long time because the Appellant repeatedly became emotional and would begin to cry and that all questioning would cease until the Appellant had regained composure. Clara Benson, the police department transcriptionist who typed the Appellant's confession, was also called as a witness. Ms. Benson related that she was seated at her computer; Lieutenant McMahon was seated to her right; the Appellant was seated in the middle; and Sergeant Davison was seated to her left. The Appellant was crying and smoking a cigarette. Ms. Benson stated that Lieutenant McMahon was very nice to the Appellant, and, when the Appellant became upset, McMahon would tell the Appellant to take her time. At the conclusion of the Appellant's statement, Benson stated that the statement was printed and that the Appellant read the statement, initialed each page, and signed the last page. Ms. Benson testified that at no time did she hear anyone threaten, coerce, or frighten the Appellant.

The proof further established that the interview with the police began around 8:15 p.m. on February 8th and that the advise of rights form was signed by the Appellant at 8:31 p.m. Initially, the Appellant denied any involvement in the death of her daughter. At the same time, police officers were also interviewing the Appellant's boyfriend, Derek Rawlings, in another room. At 12:05 a.m., on February 9th, Rawlings told the police, "I saw [the Appellant] take the baby and throw the baby up against the wall." Sergeant Craig, Rawlings' interviewing officer, then proceeded to the Appellant's interview room and read Rawlings' statement to the Appellant. Police testimony indicated that after reading Rawlings' statement, "it's like the air went out of her" and "she stopped denying what she did to the baby." The Appellant's typed statement, taken by the transcriptionist, began at 12:10 a.m. and concluded at 1:00 a.m. on February 9, 2002. The Appellant admitted in her statement that she shook the victim, threw her into the crib, and that the victim's head hit the wall.

The primary consideration in determining the admissibility of a defendant's statement is whether the confession is an act of free will. *State v. Chandler*, 547 S.W.2d 918, 920 (Tenn. 1977). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)). The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the United States Constitution. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994). For a confession to be admissible, it must be "free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." *Smith*, 933 S.W.2d at 455 (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187 (1897)).

In denying the Appellant's motion to suppress her statement, the trial court made the following findings regarding the voluntariness of her statement:

[T]he State has had several eyewitnesses testify as to the nature and circumstances surrounding the manner in which the [Appellant's] confession was given. Included is Sgt. Davison, who under oath stated that she herself did not threaten, coerce or intimidate the [Appellant]. Sgt. Davison further states that she did not hear or see any other officers threaten, intimidate or coerce the [Appellant] into signing the confession. Lastly, Sgt. Davison states that the [Appellant] never gave any indication that she did not wish to talk, nor did [Appellant] make any request for counsel . . . . [Benson testified that] the investigators were "nice" to the [Appellant] . . . . Ms. Benson further testified that she witnessed no threats or coercion used against the [Appellant] . . . [and] that she witnessed the [Appellant] signing the confession.

We conclude that the record does not preponderate against the trial court's finding that the Appellant's statement was given freely and voluntarily. The testimony accredited by the trial court established that at no time did any officer ever "threaten, coerce or intimidate" the Appellant in order to obtain a confession. After a review of the totality of the circumstances surrounding the Appellant's statement, including the Appellant's age, educational level, mental state, and the general tenor of the interrogation process, we conclude that the proof fails to establish that the statement was in any manner compelled or otherwise improperly obtained. Accordingly, we hold that the Appellant's statement confessing her involvement in the death of the eleven-month-old victim was an act of free will and, as such, was properly admitted at trial.

## II.    Sufficiency of the Evidence

The Appellant argues the evidence is insufficient to support her convictions for: (1) first degree felony murder in the perpetration of aggravated child abuse; (2) aggravated child abuse; and (3) aggravated child neglect. The Appellant's sufficiency argument is premised upon her contention that "[her] convictions rest solely upon her statement of admission." She asserts that her contested statement to the police portraying her as having malice toward her only child is totally inconsistent with other credible testimony at trial from several witnesses, including Raphiael Tyms who testified about her "lack of violent tendencies" and her "extreme patience and love for her child." The Appellant acknowledged "[she] can not argue to this Honorable Court that there is no evidence to support her conviction[s] in light of the statement of admission, [but] she submits that when properly viewed against the high standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 317 (1979) and Rule 13(e), T.R.A.P., the evidence is insufficient for a rational trier of fact to find her guilty beyond a reasonable doubt."

Rule 13(e), Tennessee Rules of Appellate Procedure, provides that "[f]indings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." The standard of review on appeal, when the sufficiency of the evidence is questioned, is "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

With regard to the Appellant's contention that her statement to the police is uncorroborated, it is well-established that a confession alone is insufficient to support a conviction for any criminal offense. *Ashby v. State*, 139 S.W. 872, 875 (Tenn. 1911); *see also State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000). To sustain a verdict beyond a reasonable doubt, the State must corroborate the *corpus delicti* or the body of the crime by proving "(1) that a certain result has been produced . . . and (2) some person is criminally responsible for the act." *Wooten v. State*, 314 S.W.2d 1, 5 (Tenn. 1958). If a verdict is "founded on slight evidence of corroboration connecting the defendant with the crime, it cannot be said, as a matter of law, that the verdict is contrary to the evidence." *Ricketts v. State*, 241 S.W.2d 604, 606 (Tenn. 1951).

### a. Aggravated Child Abuse

As relevant to the indictment in this case:

(a) A person commits the offense of aggravated child abuse . . . who commits the offense of child abuse . . . as defined in § 39-15-401 and:

> (1) [t]he act of abuse . . . results in serious bodily injury to the child
> . . . .

(b) . . . [I]f the abused . . . child is six (6) years of age or less, the penalty is a Class A felony.

T.C.A. § 39-15-402(a)(1), (b) (2003).

Tennessee Code Annotated section 39-15-401, in pertinent part, provides: "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner so as to inflict injury . . . commits a Class A misdemeanor." T.C.A. § 39-15-401(a) (2003).

At trial, Sergeant Ernestine Davison testified that the Appellant gave an inculpatory statement to the police on February 9, 2002, admitting that she inflicted serious bodily injury upon her eleven-month-old child. The Appellant's statement was introduced at trial, with the following excerpts being noted:

> Q:      On Thursday, February 7, 2002, Keona Tyms received fatal injuries inside of 2620 McAdoo. Are you the person responsible for her injuries?

A. Yes.

Q. What was your relationship to Keona Tyms?
A. Her mother.

Q. In your own words tell [me] what happened to cause these injuries?
A. She was crying and I was hearing voices, they was telling me to make her shut up. I picked her up and I shook her and I threw her on the couch and Derek was telling me to calm down and that I may need to go to Charter Lakeside. The baby was still crying and I grabbed her and threw her in the bed. She was sitting next to me on the lazy boy and she was sitting next to me and she was scared of me and I threw her in the bed and she close[d] her eyes and I thought she was sleep and I closed the door. I sit down for a minute and the voices kept telling me to kill myself. So I checked on her and I thought maybe she was still asleep, then I laid down and Dereck [sic] left at 2am and said he was going to Amoco to get some Tums and I thought I heard Keona sneeze and I rolled over and went back to sleep until 8am.

And then I woke up and found her dead and I went to a neighbor name[d] Scottie's house and I called 911 and they told me they were sending a car right out and I went back to the house and I grabbed my baby and stood on the porch until they got there. They took the baby and put her in the ambulance and the ambulance driver gave me his cell phone and I called Dereck [sic] and her father. They took the baby and they had a police officer to come down and escort the baby to the morgue. . . .

Q. Was anyone else at home with you and Keona?
A. Yes, Dereck [sic] who is my fiancée'.

. . . .

Q. What started the crying episode with Keona?
A. She wanted me to really hold her and I couldn't because they was in my head, voices.

. . . .

Q. Keona had bruises on her head. How did she get these bruises?
A. When I threw her in the bed and her head hit the wall, her bed is right by the wall. She kept crying after her head hit the wall and I tapped her leg and told her to go to sleep.

Q. How many times did you shake Keona?

-8-

Q.      Once in the living room for a couple of minutes and when I threw her in the
        bed.

Q.      How many times on Thursday did you actually shake Keona?
A.      Once.

Q.      To your knowledge, did anyone else injure Keona on Thursday?
A.      No.

        . . . .

Q.      Have you received any medical treatment for these voices?
A.      No.

        . . . .

Q.      Are you telling the truth today voluntarily and of your own free will?
A.      Yes.

Q.      Did you give this statement freely and voluntarily without any threats,
        promises or coercion?
A.      Yes.

Q.      Is there anything else that you would like to add to your statement that would
        aid us in this investigation?
A.      I did not mean to shake Keona and throw her in the crib.

Dr. Kenneth Snell, the Deputy Chief Medical Examiner for Shelby County, testified that the autopsy of the victim revealed (1) multiple injuries, (2) blunt trauma to the head, (3) subdural hematoma, and (4) retinal hemorrhage and bilateral perioccipital nerve hemorrhage. Dr. Snell opined that the injuries inflicted were consistent with a child being shaken and then being thrown and hitting a wall. The medical examiner explained that it would take "an extreme amount of shaking over a prolonged period of time to cause these types of injuries." The term "a prolonged period of time" means "it's more than just a simple shake, or one, or two simple shakes. We're talking as hard as you can and continuously." Dr. Snell concluded that the victim's injuries were not caused by an accident.

The post-mortem findings, which included blunt trauma to the head, subdural hematoma, and retinal hemorrhaging, as well as the forensic finding that these injuries were consistent with a child being shaken and then hitting a wall, are more than sufficient to corroborate the Appellant's confession. Moreover, we conclude that the proof at trial was sufficient to establish that the Appellant knowingly inflicted, other than by accidental means, serious bodily injury upon the victim who was less than six years of age.

**b. First Degree Felony Murder in the Perpetration of Aggravated Child Abuse**

As indicted in this case, first degree felony murder is defined as the killing of another committed in the perpetration of or attempt to perpetrate aggravated child abuse. T.C.A. § 39-13-202(a)(2) (2003). To convict of felony murder, there is no required mental state with respect to the homicide, as the mental state is supplied by the law. T.C.A. § 39-13-202(b). There is an intended felony, in this case aggravated child abuse, and an unintended homicide. The requisite mental state of the predicate felony, here aggravated child abuse, is transferred by law to the homicide. *See generally State v. Godsey*, 60 S.W.3d 759, 773 (Tenn. 2001).

The post-mortem narrative findings which were introduced at trial revealed: "This 11 month old black female died as a result of multiple injuries including blunt trauma to the head and shaken baby syndrome with bleeding into the eyes and about the brain."

Based upon our conclusion, *supra*, that the proof is legally sufficient to support the Appellant's conviction for aggravated child abuse, which resulted in the death of the victim, we conclude that the proof is likewise more than legally sufficient to establish the Appellant's guilt for felony murder in the perpetration of aggravated child abuse.

**c. Aggravated Child Neglect**

To convict of aggravated child neglect, as indicted in this case, requires proof of the following essential elements:

    (1)     that the Appellant did knowingly other than by accidental means:

          (a)     neglect a child so as to adversely affect the child's health and welfare; and

          (b)     the act of abuse resulted in serious bodily injury to the child; and

          (c)     that the child was six (6) years of age or less.

*See* T.C.A. §39-15-402(1)(b), (2)(b), & (3) (2003); *see also* T.P.I. Crim. 21.01 (7th ed. 2000).

It is undisputed that the victim in this case was less than six years of age. Moreover, it could be argued that the Appellant's failure to seek medical treatment for her child after inflicting the injuries could have adversely affected the child's health, at least temporarily.[1] However, the proof does not demonstrate that it was the act of neglect which caused the serious bodily injury. Rather,

---

[1]At trial, Dr. Snell testified that if the victim had received prompt medical attention, she might have survived.

the proof established that it was the Appellant's acts of abuse which produced the serious bodily injury to the minor victim. Thus, the elements of the crime have not been established.

Furthermore, we are constrained to note that aggravated child abuse and aggravated child neglect are codified in the same penal statute. T.C.A. § 39-15-402. The offense of "child abuse and neglect" is a single offense that may be committed by alternative courses of conduct. *State v. Mateyko*, 53 S.W.3d 666, 668 n.1 (Tenn. 2001); *State v. Hodges*, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998).

The record suggests that the State presented the indictments to the grand jury upon alternative theories of prosecution. At no time during the trial, at closing argument, or at the motion for new trial, did the prosecution attempt to distinguish the separate counts of child abuse and child neglect based upon spatial or factual differences.[2] Moreover, on appeal, the State makes no attempt to defend the Appellant's conviction for aggravated child neglect. Notwithstanding these shortcomings, we conclude that the proof at trial has failed to prove the existence of a requisite essential element of the crime; thus, the evidence is insufficient to support the conviction.[3]

## CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the Appellant's convictions for first degree felony murder in the perpetration of aggravated child abuse and for aggravated child abuse. We conclude, however, that the evidence is legally insufficient to support the Appellant's conviction for aggravated child neglect. Accordingly, this conviction is vacated and dismissed with remand for entry of a corrected judgment form for Department of Correction purposes.

_____
DAVID G. HAYES, JUDGE

---

[2] The determination of whether the State is preceding upon alternative theories of prosecution or upon separate and distinct crimes should be resolved at a jury instruction conference in order that the jury may be properly instructed with regard to their verdict. Obviously, if the State is proceeding upon alternative theories, the jury should be instructed that they can find the defendant guilty of one or the other of the theories, but not both.

[3] In view of our holding that the evidence is insufficient to support the Appellant's conviction for aggravated child neglect, the issue of whether the dual convictions violated double jeopardy protections is rendered moot.