STATE of Tennessee, Appellee,

v.

Kenneth Wayne O'GUINN,
Defendant-Appellant.

Supreme Court of Tennessee,
at Jackson.

March 24, 1986.

**562**

Patrick F. Martin, Charles H. Farmer, Jackson, for defendant-appellant.

W.J. Michael Cody, Atty. Gen. and Reporter, Ann Lacy Johns, Asst. Atty. Gen., Nashville, Jerry Woodall, Dist. Atty. Gen., Roger D. Moore, Asst. Dist. Atty. Gen., Jackson, for appellee.

## OPINION

DROWOTA, Justice.

The defendant, Kenneth Wayne O'Guinn, appeals his conviction of first degree murder, for which he was sentenced to death, and his conviction of aggravated rape, for which he was sentenced to life in the state penitentiary. The defendant presents three issues for review: (1) whether the trial court erred in denying his motion to suppress the admission of his statements; (2) whether the trial court erred by not granting a mistrial regarding the surprise testimony of the State's pathologist witness; and (3) whether the trial court erred by not granting certain expert witness fees pursuant to statute.

On September 6, 1983, the Madison County Grand Jury returned an indictment charging the defendant with the rape and strangulation death of Sheila Cupples. The record reveals that on Saturday evening, about 7 p.m. on May 23, 1981, Sheila Cupples, seventeen; her cousin, Joanie Cupples, twenty-two; and two other young women, Pam Johnson and Janet Pierce, went to the Hat and Cane Club, a lounge and dance hall in Jackson, Tennessee. They were celebrating Sheila's graduation from high school. Shortly after arriving, Joanie's mother and Janet Pierce's mother joined them at their table in the lounge. During the evening Sheila drank beer, took a "hit of speed," and danced with several different men. Sheila was dressed in pink pants, pink and white halter top and sandals. By eleven o'clock, she was seriously intoxicated and had to be helped to the restroom "to straighten up" by Joanie. Afterwards, she told Joanie there was someone she had to talk to across the room. Around midnight Joanie last saw her standing by the door leading from the dance floor to the lounge looking as if she was waiting for someone.

An employee of the Hat and Cane Club, Diane King, was not working that evening but was present and she danced with the defendant. She saw Sheila and the defendant leave the dance floor for the lounge at the same time. Danny Dunn was at the club that evening and he saw Sheila and the defendant in the parking lot leaving the club around eleven forty-five p.m. The heavily intoxicated Sheila tripped over a motorcycle. Danny helped her up, and the defendant led her away. Joanie, unable to locate Sheila, searched unsuccessfully for her and finally went home around four-thirty a.m.

On Sunday afternoon around three-thirty, Sheila's nude body was found lying in a weeded field at the end of a dead-end road near the Highway 45 By-pass in Jackson. It appeared that her body had been dragged about six to eight feet. A tire tool lay between her outstretched legs. Her halter top was wrapped tightly around her neck. Her face had been badly beaten. Tire tracks were found nearby before a heavy thunderstorm occurred and made the collection of certain evidence difficult. No scientific or physical evidence, such as hairs or fingerprints, connected the defendant with the body.

The County Medical Examiner and Coroner, and the former Deputy Shelby County Medical Examiner and Assistant Chief Medical Examiner for the State of Tennessee, testified extensively concerning Sheila's injuries and the cause of her death. The County Medical Examiner examined Sheila's body at the scene and the Deputy Shelby County Medical Examiner performed his autopsy in Memphis. Their testimony showed that Sheila had been dead about twelve hours when her body was first examined around 4:12 p.m. Injuries (some offensive, some defensive) to her chest, arms, and head indicated she had suffered a severe and brutal beating; but the cause of her death was ligature strangulation, that is, an object having been placed around her neck, i.e., her halter top. Once force was applied to Sheila's neck, she would have been conscious three to four minutes. Weeds caught under the halter top indicated she had been strangled in a weedy spot. A contusion with parallel bruises on either side of her left nipple might have been made by pliers or a similar object. A laceration or tear of the tissue at the front of her vagina .8 inches in length and three-fourths of an inch in depth was consistent with the forceful insertion of a hard, firm, wooden or metal object such as a tire tool into her vagina. Abrasions on her buttocks indicated the body had been dragged across the ground. The injuries to her head, neck, breast, and vagina had occurred prior to her death. Her blood alcohol was 0.18, her urine-alcohol 0.28. This was consistent with the condition of a person who had been drinking earlier and was, at the time of her death, on the "downside" of being drunk. The drug Darvon was also detected in her system. Although no spermatozoa were found either in the vagina, mouth, nasal passage or anus, seminal acid phosphates were detected.

Four statements given to T.B.I. Agent James Leach by the defendant in August 1983, in which he confessed to murdering Sheila, were read to the jury. The defendant told how he traveled from Huntsville, Alabama, to Jackson, where he went to the Hat and Cane Club. Sheila, whose name he did not know, kept running into him at the club. He admitted drinking and taking two or three Darvon, which Sheila gave him. Sheila was drunk and he took her outside to sober up about 11:30. The two rode around in his car and eventually parked behind a Jackson service station. They at least partially disrobed but began to argue, and the defendant choked Sheila with his hand, then stopped and apologized. They had a drink and then she grabbed the bottle of whiskey and started pouring it out of the window, reminding him of his former wife, and he choked her with her "blouse" until she was dead. He admitted striking her before she was dead and twisting her breast with his hands after she died. The defendant could not remember inserting anything into her vagina, although he claimed she was dead if he did do it. He told how he put her body into the trunk of his car, drove to a dead-end road off the Highway 45 By-Pass, and placed the body in a grassy field. He then drove back to Huntsville about daybreak, throwing her clothes in the Forked Deer River.

Defendant's proof consisted of the testimony of Joanie Cupples' mother that she had last seen Sheila at the Hat and Cane Club around twelve to one a.m. that night. To counter earlier testimony by Joanie that the defendant had spoken rudely to Sheila at the Hat and Cane Club on the Thursday before her death, the defendant presented Sharon Wyatt, another of Sheila's cousins, who testified that it was the defendant's brother, Robert O'Guinn, who had made the ugly comment. Sharon had not seen the defendant there on Thursday. Lastly, the defendant introduced a composite photograph made by the Jackson police from descriptions given them.

At the sentencing hearing the State presented no new evidence except to pass to the jury previously introduced photographs not yet shown to the jury which depicted the condition of the victim's body.

The defendant's mother testified on his behalf and told how the defendant's father, from whom she had been divorced in 1966,

had run the defendant away from home when he was thirteen or fourteen years old. Her son had been married and divorced and had three children. His relation with his father was strained, particularly because his former wife had had an affair with his father in 1968 or 1969.

### I.

■ The defendant first argues that the trial court erred in not suppressing his statements given to T.B.I. Agent Leach because he misunderstood his right to counsel when he gave the statements. He thought his right to counsel was contingent on the future event of appointment by the court and that he would only get an attorney appointed when he got to court.

On July 4, 1983, the defendant was arrested and incarcerated in the Madison County jail in Huntsville, Alabama, on Alabama charges of rape and first degree assault upon Betty Ivey. On that date, he was interrogated by investigator Al Duffey of the Madison County Sheriff's Department. The defendant was interrogated a number of times by Duffey and other officers of the Alabama jurisdictions where he was being held. Duffey testified that on each occasion the defendant was given his *Miranda* warnings. The defendant was being questioned about the Ivey case, and about the unsolved murder of Linda Muller, which had occurred in Alabama. When, as a result of these conversations, Duffey obtained information from the defendant concerning the Shiela Cupples murder in Tennessee, Tennessee authorities were contacted and eventually T.B.I. Agent Leach came to Alabama to question the defendant.

The first contact Agent Leach had with the defendant was on August 10, 1983. On that date, Agent Leach contacted defendant's Alabama appointed counsel in the Ivey case for permission to talk to the defendant. He was given permission to talk to the defendant about anything except the Alabama charges for which the attorney had been appointed to represent the defendant. At this time Agent Leach

advised the defendant of his *Miranda* rights. Apparently, the defendant was implicating his brother Robert in the killing.

On August 12, the defendant sent word that he wanted to talk with Duffey and his rights were again read to him from a *"Miranda* card," and he indicated that he understood them. During the course of his questioning on the Alabama murder, the defendant mentioned the Jackson, Tennessee incident, at which time Duffey brought Agent Leach in to talk with the Defendant. Duffey advised Leach that he had already informed the defendant of his rights and the defendant affirmed that Duffey had read him his rights and that he was giving his statement freely and voluntarily. A tape recorded statement was made at this time. Later, at 6:02 p.m., a handwritten statement was obtained from the defendant by Agent Leach in which Leach advised the defendant of his rights, including the right "to have an attorney present during questioning and that if you cannot afford one, one will be given to you free by the court." The defendant signed the statement, and acknowledged his signature at the suppression hearing.

Three days later, on August 15, Agent Leach again interrogated the defendant in Huntsville and obtained two other statements. What was defendant's third statement (second taped) concluded at 5:50 p.m. His fourth statement (second handwritten) began at 6:52 p.m. Agent Leach testified, as did the defendant, that defendant was advised verbally of his rights. Agent Leach admitted that he did not use a written waiver because it made people "leary" and less willing to talk.

Agent Leach considered the Tennessee investigation separate and distinct from that in Alabama and was not concerned with how Alabama conducted its investigation. Both defendant and Agent Leach agreed that defendant made no request of Agent Leach for an attorney during any of Agent Leach's interrogations of him. While defendant, Agent Leach, and investigator Duffey agreed that defendant was not mistreated, threatened or coerced dur-

ing the interrogations, it does appear that the session on August 12 extended over a substantial period of time. The defendant testified that although the authorities did not seem to deprive him of any necessities or mistreat him intentionally, he gave the statements because he was tired from lack of sleep and of being interrogated almost constantly for the three days of August 12–15; he was also suffering pain from dental work.

Defendant stated that he had agreed to talk to the Alabama authorities until Duffey began questioning him about murder, and then he asked for counsel. When Duffey was asked by defendant's counsel isn't it true that O'Guinn indicated that if you were going to continue to discuss murder that he better have his lawyer? Duffey's response was "No, sir, not to my knowledge." On two other occasions Duffey stated, "at no time to my knowledge did he ever ask for an attorney." O'Guinn, on the other hand, testified that he told Duffey that he wanted a lawyer and that Duffey said, "you won't be able to get a lawyer until you go to court." O'Guinn avers that he understood that he couldn't get a lawyer until he went to court on the charge. He stated that, "I was misled on getting a lawyer."

Defendant testified that he never understood what the right to an attorney meant because of the initial misinformation given to him by Duffey. Defendant admitted that he understood what the right to remain silent meant at the time his rights were read to him but that only now does he understand what the right to an attorney means. Defendant testified that he did not ask Agent Leach for an attorney because he had already asked and been refused by Alabama authorities.

Three witnesses testified at the suppression hearing, investigator Duffey, T.B.I. Agent Leach, and the defendant, Kenneth O'Guinn. O'Guinn's theory at the suppression hearing was that he did not understand when he was to receive the advice of counsel, that he was misinformed. Defense counsel throughout the examination of the various witnesses at the suppression hearing stated what O'Guinn's theory was and the trial court responded, "I know what your position is."

At the conclusion of the hearing, after arguments on behalf of the State and the defendant, the trial court made a statement for the record, in accordance with Rule 12(e), T.R.Crim.P., in which he set out the positions taken by defendant in his motion to suppress and then proceeded to overrule the motion and allow the State to introduce the four statements. Although the trial judge did not render detailed findings, as we would have preferred, it is obvious that the trial court accredited the testimony of the two law enforcement officers and not that of the defendant, that he was misinformed by investigator Duffey.

The issue of credibility of witnesses is primarily that of the trier of fact, in this case, the trial judge, since he had the opportunity to hear the witnesses and to observe them as they underwent examination. *Houston v. State*, 593 S.W.2d 267, 271 (Tenn.1980). The trial court's findings contain resolutions of the factual and credibility issues against the defendant. Implicit in the trial court's findings is that investigator Duffey never misrepresented defendant's right to counsel. The trial court's denial of the motion to suppress resolves the credibility issues against the defendant.

It is well-settled in Tennessee that the "trial court's determination with reference to compliance with the *Miranda* mandate by the investigating officers and as to the voluntariness of statements made by the defendant during custodial interrogation, is conclusive on appeal unless the appellate court finds that the evidence touching those matters preponderates against the trial judge's findings. Upon appeal, the defendant has the burden of showing that the evidence preponderated against such a finding by the trial judge." *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn.Cr.App.1975); citing [*Briggs v. State*, 501 S.W.2d 831 (Tenn.Cr.App.1973) and cases therein cit-

ed; *Mitchell v. State*, 3 Tenn.Cr.App. 494, 464 S.W.2d 307 (1971).]

Since the facts govern each case and no talismanic test exists to resolve *Miranda* issues, once the facts surrounding the giving of statements are resolved by a trial court's determination, that finding is "binding upon the appellate courts if there is any evidence to support it." *State v. Chandler*, 547 S.W.2d 918, 923 (Tenn.1977); *Monts v. State*, 218 Tenn. 31, 400 S.W.2d 722 (1966). Here the trial court made a ruling that resolved the conflicts and discrepancies in the evidence concerning defendant's statements in favor of the state and we may therefore conclude that the confessions were obtained with proper regard for defendant's *Miranda* rights, since there is substantial evidence in this record to support the ruling of the trial court. The evidence clearly does not preponderate against the trial court's findings.

We need not, in this case, address the issue of the effect of misinformation concerning *Miranda* rights on the voluntariness of a confession, since it was implicit in the trial court's ruling that the defendant was not misinformed.

## II.

The defendant next argues that the trial court erred by not granting a mistrial regarding the surprise testimony of the State's pathologist witness. The defense avers that this witness testified for the first time at trial that sexual penetration occurred prior to death.

This witness, Dr. Charles Harlan, was formerly the Deputy Shelby County Medical Examiner and at the time of trial was Chief Medical Examiner for Metropolitan Nashville-Davidson County. The defense contends that early in their investigation it was determined from this witness, who was then in Nashville, that his supervisor at the time of the autopsy, the Chief Medical Examiner from Shelby County, could answer the defendant's inquiry regarding penetration and time of death because the witness's records had been left in Memphis. After contacting Dr. Fransesco, the Chief Medical Examiner in Shelby County, defense counsel was informed that no such determination was or could be made to indicate that the victim was alive or dead at the time of sexual penetration.

The State argues that the way the question was phrased to Dr. Fransesco was all important and very likely would make a difference in his response. The State argued that while it might be accurate to state that no determination could be made to indicate if a victim was alive or dead at the time of vaginal penetration by the male sexual organ, it would not be accurate if the vaginal penetration was caused by the forceful entry of a hard wooden or metal object which caused a laceration or tear of the tissue.

Dr. Harlan testified as follows:

"Q. Were you able to form a medical opinion as to whether Sheila was alive or dead at the time this injury was inflicted?

A. Yes, sir.

Q. And what is that opinion?

A. It is my opinion that this injury, this laceration, occurred prior to her death.

Q. And upon what do you base that opinion.

A. That opinion is based on the fact that the edges of this laceration are rolled, that is, they have a round curvature, and there is edema in that edge, and there is erythema or redness around it. There is also blood coming from that laceration. If this had been a post-mortem injury then there would not be the erythema and the rounding of edge, rather it would have a jagged, sharp edge, and there would not be the erythema present in this wound."

It is this testimony which surprised defense counsel and which was the basis for the motion for mistrial. At a jury-out hearing on defendant's motion for mistrial, the Attorney General stated to the court: "All I want to say is throughout this I did not know what Dr. Harlan would say about this ... we didn't know until he went on the stand." The State argues that when

defendant filed a motion for discovery, defense counsel was provided a copy of Dr. Harlan's autopsy report pursuant to Rule 16(a)(1)(D), T.R.Crim.P. The autopsy report, by definition, limits itself primarily to a determination of the cause of death. The State contends that defense counsel's surprise cannot be attributed to the State and is not a proper basis for a mistrial. We agree. We fail to find on the record before us that the State violated Rule 16(c), T.R. Crim.P., dealing with a continuing duty to disclose. *Cf. State v. Brown*, 552 S.W.2d 383, 386 (Tenn.1977), where this Court noted with approval the A.B.A. Standards Relating to Discovery and Procedure Before Trial; § 2.4 (prosecuting attorney charged only with using "diligent good faith efforts" to obtain discoverable material or information from other governmental personnel).

The defendant avers that Dr. Harlan's testimony was prejudicial to the defense in that it formed the sole basis for the conviction of aggravated rape because his was the only evidence that the victim was alive at the time of penetration. The defense strategy was to obtain a judgment of acquittal as to the rape charge so that the State would be prevented from arguing and obtaining a felony murder instruction.

The testimony of Dr. Harlan was not the only evidence before the jury that the victim was alive at the time of penetration. The jury could logically infer from defendant's own testimony that the victim was still alive. Defendant stated in his first statement given on August 12th that "I can't say I had sex with the girl or not. I cannot tell you to be truthful but I did beat on the girl." He later stated that "the best I can remember, she was" dead when I used the stick. In response to why he used the stick if she was already dead, he replied: "I don't know." Later he was asked: "Did you think maybe she wasn't dead?" And he responded: "I don't know that. I . . . in my mind, I really thought she was dead when I put her in the trunk of my car. And when I got out there and I put her out at that little patch right out there in that little field, I don't know, maybe I

thought she wasn't dead and I just, maybe I just picked up a stick and threw it in her, it's just the way it went. I don't, I don't know. I don't know." There was sufficient doubt raised by defendant's own testimony to make a jury issue on whether she was dead or not at the time of penetration, without Dr. Harlan's opinion evidence.

■ It should be pointed out that the jury did not return a felony murder conviction. The defendant was indicted for, and convicted of, common law first degree murder. Also, although the trial court charged three aggravating circumstances:

"(1) The murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind;

(2) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the Defendant;

(3) The murder was committed while the Defendant was engaged in committing, or was attempting to commit, or was fleeing after committing or attempting to commit rape";

the jury found only that "the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Thus it would appear that defendant has failed to demonstrate any prejudice as a result of Dr. Harlan's testimony. Although a murder victim must be alive in order to be tortured, a victim need not have been alive in order to demonstrate the perpetrator's depravity of mind if the *acts* occurred so close to the time of the victim's death that the inference can be fairly drawn that the murderer possessed that depravity of mind at the time of the actual killing. *State v. Williams*, 690 S.W.2d 517, 529–530 (Tenn.1985).

Even if, *arguendo*, Sheila Cupples was dead when the defendant twisted one of her nipples with a pliers-like instrument until it left a ridged abrasion, and rammed a hard, firm object into her vagina with such force that it tore the elastic vaginal tissue, the aggravating circumstance remains appropriate because such acts took

place so close to the time of her violent and brutal beating and her strangulation that the inference can be fairly drawn that the defendant possessed the requisite "depravity of mind."

■ The defendant argues that although the jury could have found the crime involved depravity of mind without the testimony of Dr. Harlan, the failure of the trial court to explain the meaning of this term is reversible error, citing *State v. Williams, supra.* The instruction requirements set out in *State v. Williams* are not to be applied retroactively. The trial court in this case, as in *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985), gave the pre-*Williams* instruction with no interpretation of the words. The defendant made no objection in *Duncan,* or in this case. The proof in *Duncan,* as in this case, "does support the aggravating circumstance as defined in *Williams.*" 698 S.W.2d at 71. We accordingly find the proof in this cause clearly supports a finding of depravity.

### III

■ The defendant's final argument is that the trial court erred in denying his motion to retain expert witnesses at state expense, pursuant to T.C.A. § 40–14–207(b). That statutory provision provides as follows:

> In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such *court* in an *ex parte* hearing *may in its discretion* determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If such determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the reimbursement of reasonable and necessary expenses by the executive secretary of the Supreme Court as authorized by this part, and rules promulgated

thereunder by the Supreme Court. (emphasis added)

This statute permits a court in a capital case, when in its discretion it determines that expert, investigative or other similar services are necessary to protect the constitutional rights of an indigent defendant, to authorize these services at state expense.

On December 10, 1984, the defendant filed a "Motion For Permission to Retain Experts." The defendant moved the court "for permission to retain a clinical psychologist or psychiatrist, an investigator and any other expert reasonably necessary to insure the Constitutional rights of the defendant."

On January 3, 1985, the motion was heard and taken under advisement by the trial court. On January 9, 1985, the trial court entered an order in which he stated: "the Defendant has been found competent to stand trial in both Alabama and Tennessee after examinations by three psychiatrists and, moreover, that the Court's own observation of the Defendant during testimony in open court in a suppression hearing leads the court to believe that no further examinations are necessary; therefore, defense motion is found to be without merit."

As pointed out by the trial judge in ruling on the motion, not only did he have before him the examinations by the two State psychiatrists, but the mental examinations of the defendant performed in Alabama, which had also been made available to defense counsel. The court felt that from these reports and his own observations of the defendant at the suppression hearing, that no further examinations were necessary and he denied defendant's motion. We cannot say that the trial court abused its discretion under the statute in denying defendant's motion to retain expert witnesses at state expense.

■ We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205(c) and are satisfied that the evidence warrants imposition of that penalty.

The defendant's conviction of first degree murder and the sentence of death, and his conviction of aggravated rape with a life sentence, are affirmed. The sentence of death will be carried out on the 26th day of June, 1986, unless stayed by appropriate authority. Costs are adjudged against the defendant.

FONES, HARBISON and COOPER, JJ., concur.

BROCK, Chief Justice, concurs in part and dissents in part.

For the reasons stated in my dissent in *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981), I would hold that the death penalty is unconstitutional; but, I concur in all other respects.