**Kenneth Wayne O'GUINN**

v.

**Michael DUTTON.**

No. 3:90–0899.

United States District Court,
M.D. Tennessee,
Nashville Division.

March 31, 1993.

Michael Passino, Passino & Minton, Nashville, TN, for plaintiff.

Mark Fowler, Debra Inglis, & Glenn Pruden, Office of the Atty. Gen., for the State of Tennessee, Nashville, TN, for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

Kenneth Wayne O'Guinn has confessed to murdering two women and assaulting another. He is now serving a life sentence for aggravated rape and awaiting a death sentence after his conviction of first degree murder. After affirmance on appeal and two rounds of post-conviction proceedings in state court, he now petitions this court for writ of federal habeas corpus under 28 U.S.C. § 2254. Because the State of Tennessee obtained his confession in violation of his privilege against self-incrimination and because he received ineffective assistance of counsel during sentencing, this court will grant the petition and issue a writ of habeas corpus to the respondent, Michael Dutton.

## I. PROCEDURAL HISTORY

O'Guinn confessed that on 23 May 1981 he murdered a seventeen year old girl named Sheila Cupples in Jackson, Tennessee. On 6

September 1983, a Madison County, Tennessee, grand jury returned a two-count indictment charging O'Guinn with first degree murder and aggravated rape. A jury trial resulted in a guilty verdict on both counts on 22 January 1985. In a separate proceeding, as provided by Tennessee Code Annotated § 39–2–202,[1] the jury fixed the death penalty.

The Tennessee Supreme Court affirmed on 24 March 1986, *State v. O'Guinn,* 709 S.W.2d 561 (Tenn.1986), and the United States Supreme Court denied certiorari on 6 October 1986. *O'Guinn v. Tennessee,* 479 U.S. 870 107 S.Ct. 244, 93 L.Ed.2d 169 (1986). Since then, O'Guinn has filed two state post-conviction petitions, each addressing different issues.[2] The trial court dismissed the first on 5 July 1988. The Tennessee Court of Criminal Appeals affirmed on 30 August 1989, and the Tennessee Supreme Court denied leave to appeal on 2 January 1990. The second petition was dismissed on 6 September 1989. The Court of Criminal Appeals affirmed on 9 May 1990, and the Tennessee Supreme Court denied leave to appeal on 30 July 1990.

## II. FACTS

The facts involving O'Guinn's confession are very simple. On 4 July 1983, Alabama authorities arrested O'Guinn for the assault and rape of an Alabama woman named Muller. He was represented on that charge by attorney Mark Sandlin. O'Guinn spoke freely with Alabama investigator Duffey; he admitted the assault but denied the rape. However, a week later when Duffey read him his *Miranda* rights and asked about Muller's murder, O'Guinn stated that since murder was involved, he should have an attorney. He could not afford to hire Sandlin, so he requested that one be appointed.

According to the Alabama suppression hearing transcript, Duffey explained that O'Guinn could have an attorney, but that he would be appointed only after they went to court. About three weeks later, on 12 August 1983, O'Guinn incriminated himself in Muller's murder. Because Duffey misinformed O'Guinn of his rights, the trial court suppressed O'Guinn's statements relating to the Alabama murder. The Alabama Court of Criminal Appeals affirmed in *State v. O'Guinn,* 462 So.2d 1052 (Ala.App.1985), on the grounds that O'Guinn's waiver of the right to have counsel present was not knowing and intelligent. *Id.* at 1054.

On the day O'Guinn confessed to the Alabama murder, 12 August 1983, Agent Leach of the Tennessee Bureau of Investigation interrogated him concerning the murder of Sheila Cupples. When Leach arrived, he did not advise O'Guinn of his Miranda rights because Duffey told him he had already done so.[3] Consequently, Leach relied on Duffey's reading and the meaning O'Guinn attached to it; that he was not entitled to have an attorney present during questioning until he appeared in court. O'Guinn then confessed that he murdered Cupples.

## III. DISCUSSION

Of the issues raised in the petition, the court considers only two to have any merit. The others will be mentioned only briefly. The dispositive issues involve O'Guinn's privilege against self-incrimination and his sixth amendment right to the effective assistance of counsel at the sentencing phase of his trial. We note at the outset that the function of this court in habeas corpus proceedings is not to pass upon the question of guilt or innocence, but only to decide whether the

1. Now codified at TCA § 39–13–204.

2. The first petition claimed ineffective assistance of counsel, unconstitutional prison conditions, death-qualified jury selected, inadequate jury instructions, *Sandstrom* error, absence of objective criteria in death penalty statute, and death sentences imposed pursuant to arbitrary patterns inherent in the penalty statute and in statewide application. The second claimed ineffective assistance of trial, appellate, and post-conviction counsel, trial court errors at pre-trial, trial, and

sentencing stages, unconstitutional death penalty statute, and unconstitutional imposition of death sentence.

3. Leach testified that he had personally advised O'Guinn of his rights two days earlier, but it is unclear whether O'Guinn was yet a suspect in the Tennessee murder. In any event, it is clear that Leach relied on Duffey's reading of rights on the 12th, which was the first time O'Guinn incriminated himself in the Tennessee murder.

petitioner's conviction and sentence were obtained constitutionally.

## A. The Privilege Against Self-incrimination.

After carefully reviewing the record, the court finds as follows:

1. The Alabama suppression hearing transcript shows that roughly one week after O'Guinn's arrest on the Ivey rape/assault charges, Alabama investigator Duffey read O'Guinn his *Miranda* rights incorrectly, leading O'Guinn to believe that the only way he could obtain an attorney during questioning was to go to court first. This is the way O'Guinn understood his rights during the entire four-week interrogation period until he confessed.[4]

2. Special Agent Jimmy Leach of the Tennessee Bureau of Investigation questioned O'Guinn on 12 August 1983 regarding the Cupples murder in Jackson, Tennessee, while O'Guinn was still in custody of the Alabama authorities. During this interrogation, O'Guinn confessed to the Cupples murder.

3. When Leach arrived, he did not read O'Guinn his rights. Instead, he determined that Duffey had, and proceeded to take O'Guinn's confession.[5]

 *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires

4. The following dialog is taken from the Alabama suppression hearing transcript:

CROSS–EXAMINATION OF INVESTIGATOR DUFFEY:
Q: Now, sir, you read him his rights and talked to him on July 4th about the Betty Ivey rape and assault case?
A: Yes, sir.
Q: He gave you statements right away on that and then approximately a week later you came back and started interviewing him on the Muller murder?
A: Yes, sir.
. . . .
Q: Now, on that occasion, the first time then that you actually specifically set out to interview Mr. O'Guinn in regard to the Muller case, I presume you did advise him of his rights again by reading them from your card.
A: That or a sheet. We have a waiver sheet that basically says the same thing as the card does. I either read it off the card or off the waiver sheet that he signed.
. . . .
Q: When you advised him of his rights and told him you wanted to talk to him about the Muller murder, did he express any hesitance at all on that occasion?
A: Other than deny it, said the only thing he knew about it was what he read in the paper.
Q: Did he not express to you, after you had advised him of his rights, or at the time you advised him, that because it was murder he felt he was going to need a lawyer?
A: He could have, I don't remember it but he could have.
. . . .
Q: Is that not what you told Mr. O'Guinn on this occasion that yes, they would give him a lawyer when he got to court?
A: I may have told him that if he went to court that the courts would appoint him one.
. . . .

DIRECT EXAMINATION OF KENNETH WAYNE O'GUINN:
Q: Now, you understood him when he read the rights, to say that you could have a lawyer appointed if you could not afford one, to be present when you were questioned?
A: I understood what he was reading off to me and all but that's the reason I told him I couldn't afford a lawyer and I asked him when I could get one, how could I get one, and he said you will get one when you go to court, so I just had in my mind that the only way I could get a lawyer was to go to court first.
Q: Did you ever in any subsequent times when you were questioned by him, or other investigators, when you were advised of your rights prior to subsequent questioning, did you ask again for an attorney?
A: No, sir, because I had the understanding I had to go to court before I could get one.

5. The Tennessee suppression hearing transcript contains the following dialog:

DIRECT EXAMINATION OF SPECIAL AGENT LEACH:
Q: With respect to talking with Mr. Kenneth Wayne O'Guinn, I'll ask you whether or not you had a conversation as to whether or not Mr. O'Guinn had been advised of his certain constitutional rights?
A: On the 12th at the time that I went to speak with Mr. O'Guinn, Mr. Duffey stated to me he had already read him his rights. I asked Mr. O'Guinn and he affirmed that as is noted in the taped statement.
Also in the record is the transcript of O'Guinn's taped confession:
AGT. LEACH: Did Mr. Duffey advise you of you rights before we started talking to you about this?
MR. O'GUINN: Yes, sir.
AGT. LEACH: You gave this fre ... statement freely and voluntarily.

O'Guinn's waiver of his right to counsel during questioning to have been knowing and voluntary. For a waiver to be knowing, it must be made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).[6] O'Guinn's uncontradicted testimony in the Alabama suppression hearing indicates that investigator Duffey misinformed O'Guinn of the nature of his right to counsel. Therefore, his "waiver" of the right to have counsel present during questioning regarding the Alabama murder could not have been knowing. As to the interrogation regarding the Tennessee murder, there is no evidence that any Tennessee authorities misinformed O'Guinn of his rights, but the record does clearly show that before O'Guinn confessed, Agent Leach failed to read him his rights at all. Instead, he relied on the fact that the Alabama investigator had already read them. In doing so, Agent Leach assumed the meaning Duffey had conveyed to O'Guinn concerning those rights. There, too, O'Guinn's waiver could not have been knowing.

■ We note here that we disagree with the holding of the Tennessee Supreme Court in affirming the trial court's denial of the motion to suppress. That court held that the trial court's denial of the motion resolved the question of O'Guinn's credibility against him. To reach this conclusion, the Supreme Court had to presume that the trial court found O'Guinn's testimony concerning his request for counsel to contradict the State's evidence.[7]

This court cannot agree with that holding. Considering the record as a whole, the Ten-

nessee suppression transcript is ambiguous on this point. In that hearing, O'Guinn's attorney asked Duffey the following questions:

> Q: Now isn't it true at a certain point in time that Mr. O'Guinn had indicated to you that if you were going to continue to discuss murder that he better have his lawyer?
>
> A: No, sir, not to my knowledge.
>
> . . . . .
>
> Q: Now, I'm going to ask you—show you a document first I suppose. I'll ask you if you can recall in that hearing that you made the statement that Mr. O'Guinn did say that or could have said that?
>
> A: No, sir, I don't remember saying that in the motion to suppress evidence down there. I was asked did he request an attorney and I told him not to my knowledge because in the interview on August the 12th of 1983, Kenneth Wayne O'Guinn was advised of this rights by me on tape, and he answered that he understood his rights. At no time to my knowledge did Kenneth Wayne ask for an attorney.

Duffey could truthfully answer as he did if he believed that the lawyer's questions at the Tennessee suppression hearing referred to the 12th only. Indeed, the Alabama suppression transcript contains the following dialog specifically referring to the events of the 12th:

> Q: Now, prior to his breaking down and crying, did anybody threaten him or harm him in any fashion that caused him to cry?
>
> A: No, sir.

MR. O'GUINN: Yes, sir.

6. The court expresses no opinion as to the voluntariness of O'Guinn's confession.

7. This holding is reported at *State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn.1986):

Defendant stated that he had agreed to talk to the Alabama authorities until Duffey began questioning him about murder, and then he asked for counsel. When [at the Tennessee suppression hearing] Duffey was asked by defendant's counsel isn't it true that O'Guinn indicated that if you were going to continue to discuss murder that he better have his lawyer,

Duffey's response was "No, sir, not to my knowledge." On two other occasions Duffey stated, "at no time to my knowledge did he ever ask for an attorney." O'Guinn, on the other hand, testified that he told Duffey that he wanted a lawyer and that Duffey said, "you won't be able to get a lawyer until you go to court."

. . . .

Although the trial judge did not render detailed findings, as we would have preferred, it is obvious that the trial court accredited the testimony of the two law enforcement officers and not that of the defendant.

Q: At any time did he ever stop and state to you that he wanted to have an attorney with him before he proceeded?

A: No, sir.

However, as noted above,[8] investigator Duffey did state at the Alabama suppression hearing that O'Guinn "could have" requested an attorney when first questioned about the Muller murder, but that he did not remember. He also admitted that he "might" have told O'Guinn that he would get an attorney when he got to court. His certainty at the Tennessee hearing mirrors that which he displayed at the Alabama hearing **when asked specifically if O'Guinn requested an attorney on the 12th.** But when asked at the Alabama hearing whether O'Guinn had requested an attorney the week following his arrest, Duffey admitted it was a possibility.[9] The only reasonable conclusion, then, is that Duffey testified truthfully at the Tennessee hearing, but that he misunderstood the lawyer's question to refer only to whether O'Guinn requested counsel on the 12th. Consequently, the testimony at the Tennessee suppression hearing was not in conflict, and because there was no conflicting testimony, this court cannot agree that the trial court necessarily resolved O'Guinn's credibility against him.[10]

■ Considering the record as a whole, this court finds that O'Guinn's waiver of the right to have counsel present when he confessed to the murder of Sheila Cupples could not have been made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Consequently, the confession should have been suppressed. Furthermore, the

8. See supra, note 4.

9. Note also that the Alabama hearing took place less than one year after the interrogation, whereas the Tennessee hearing occurred a year-and-a-half later.

10. Even if the trial court did make the factual determination that the testimony was in conflict, since the Alabama suppression transcript was not a part of the state record, this court finds pursuant to the last paragraph of 28 U.S.C. § 2254(d) that such a finding would be clearly erroneous.

11. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (constitution pro-

court finds that the failure to suppress did not result in harmless error since the confession constituted the most important evidence at O'Guinn's trial. Without it, no reasonable trier of fact could find him guilty beyond a reasonable doubt based solely on the other evidence at trial.[11]

**B. Violation of Due Process at Sentencing.**

The following is the entire presentation of evidence at the sentencing phase of O'Guinn's trial.

THE COURT: Ladies and gentlemen, there is another hearing, but this shouldn't take near as long to charge you as the other one. I'm going to let the state proceed at this time.

MR. MOORE: Your Honor, at this point in time, for the State's evidence, all we would ask is that the jury rely upon all the evidence they have heard in the main part of the trial, and we have exhibits 8, 9, and 14 which have already been introduced and we ask that they now be passed to the jury.

THE COURT: Let them be passed.

MR. MOORE: You Honor, if it please the Court, the passing of these photographs in conjunction with the proof the jury has already heard is the proof the State would introduce at this portion of the hearing.[12]

THE COURT: The State says they have no other proof other than these photographs. Is there anything for the defendant?

MR. FARMER: Yes, sir, I would call Mrs. Dubbie Page.

tects the right to be convicted only on evidence sufficient to support a finding by a rational trier of fact of guilt beyond a reasonable doubt); Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (failure to suppress confession improperly obtained is subject to harmless error analysis).

See Section C, infra, for a discussion of the sufficiency of the remaining evidence.

12. In this way the state incorporated the proof presented at the guilt phase of trial, including the testimony of Dr. Harlan regarding the heinous, atrocious, or cruel circumstance.

DIRECT EXAMINATION BY MR. FARMER

Q: What is you name, please, ma'am?

A: Dubbie Page.

Q: And Mrs. Page, are you related to Kenneth O'Guinn?

A: Yes, I am.

Q: What is your relationship?

A: I'm his mother.

Q: Mrs. Page, are you still married to Kenneth's father?

A: No, sir.

Q: When did you divorce him?

A: It was in '66.

Q: How old was Kenneth?

A: Thirty-eight.

Q: Did he live at home with you and your ex-husband until he was—When did he leave your home?

A: When he was a teenager.

Q: How old was he?

A: Approximately 13 or 14.

Q: And why was it that he left home?

A: His daddy run him off.

Q: Has Kenneth been married before?

A: Yes, sir.

Q: How many times?

A: Once.

Q: Is his former wife living?

A: Yes, she is.

Q: Is he divorced from his former wife?

A: He is now.

Q: And when was he divorced from her?

A: I don't really know, about nine or ten years ago.

Q: And do you know why?

A: I know what I was told by his wife.

MR. WOODALL: I object to what she was told by his wife.

THE COURT: Sustained.

Q: Do you know of the relationship between Kenneth and his daddy before he died?

A: Well, it was all right. It wasn't really good, but they spoke.

Q: And do you know what their difficulty was?

A: I know some of it.

Q: What is that?

A: Because his wife had an affair with his daddy.

Q: And in what year was that?

A: About '68, '69, something like that.

Q: Did they have any children, Kenneth and his wife?

A: They have three.

Q: Do you know where they are?

A: In Alabama.

Q: Do you know why they are not here?

A: Not really off hand, no.

MR. FARMER: I believe that's all.

MR. WOODALL: No questions.

This witness was then excused. The lawyers made their arguments, the judge charged the jury, and the jury returned a verdict imposing the death penalty.

■ This court finds that O'Guinn received the ineffective assistance of counsel. To show a violation of the Sixth Amendment on this claim, the petitioner must show (1) that counsel's performance was deficient, and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). At a capital sentencing hearing, the jury's duty is to consider whether a person convicted of capital murder should live or die based on (1) the facts and circumstances of the crime; and (2) the convicted person's background and character. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality). The only way to be sure the jury does this is to investigate these two areas, yet O'Guinn's counsel investigated neither.

The hearing on O'Guinn's petition disclosed that Mr. Martin thought that Mr. Farmer would investigate the sentencing factors. Mr. Farmer thought that he was in charge only of the sentencing argument, and no one investigated O'Guinn's background. Considering the importance of a sentencing hearing, the failure to investigate and put on mitigating evidence amounts to the deficient performance of counsel.

To show that O'Guinn was prejudiced by this failure, he must show that but for coun-

sel's unprofessional error, the result of the proceeding would likely have been different. In this case, had counsel investigated O'Guinn's background and character, they could have presented strongly mitigating evidence based upon which the jury might have refused to impose the death penalty.

Summarizing this evidence, the jury would have considered that O'Guinn grew up in abject poverty. His parents abused his siblings and him both physically and sexually during their childhood. His parents brought alcoholism and criminal behavior into the family. O'Guinn ran away from home repeatedly to escape his home life. He suffered lasting emotional trauma when he accidentally killed a woman while driving a carnival truck. O'Guinn eventually married and worked regularly to support his wife and their three children, but he suffered additional emotional trauma when she had an affair with his father and broke up their marriage. There is additional evidence of the same character.

The court finds that had the jury considered this evidence, there exists a reasonable probability that it would not have sentenced O'Guinn to die for the murder of Sheila Cupples. This establishes a prejudicial deficiency in counsel's performance, which resulted in a violation of O'Guinn's right to the effective assistance of counsel.

### C. Sufficiency of the Evidence.

The court agrees that without O'Guinn's confession, the remaining evidence is insufficient to support a finding of guilt beyond a reasonable doubt. The only physical evidence presented at trial were brown head hairs dissimilar to the victim's which could not be associated with O'Guinn. The only non-physical evidence that did connect O'Guinn to the murder was the testimony of two persons who placed him at the last place the victim was seen alive. The circumstances under which these persons observed what they recounted were such that their testimony and the physical evidence are simply insufficient to convince any rational trier of the fact of guilt beyond a reasonable doubt.

### D. Use of Perjured Testimony.

The petitioner claims that the State used the perjured testimony of Dianna King (now Pitzenbarger). In support, she stated at the habeas hearing that Jackson Police Investigator George Blanton intimidated her into testifying against O'Guinn, but the court does not find her to be credible.

### E. Surprise Testimony of Dr. Harlan.

At trial, the State adduced the testimony of Dr. Harlan to the effect that a certain vaginal wound had occurred before death. This was a surprise to both the State and O'Guinn. At the habeas hearing O'Guinn presented the testimony of Dr. Sperry to rebut Dr. Harlan. However, Dr. Sperry testified only that he was unable to make the determination that Dr. Harlan claims to have made. Considering Dr. Harlan's expert qualifications, the court is inclined to find that Dr. Sperry's testimony would not have rebutted Dr. Harlan's. As such, O'Guinn has failed to show that any prejudice resulted from the surprise testimony.

### F. The Brady Claim.

O'Guinn's petition raises the claim that the State purposely sequestered two witnesses who would have exculpated him. They testified at the hearing to this effect, but the court finds their testimony to be completely incredible.

### G. Challenge to Tennessee's Death Penalty Statute.

O'Guinn challenges Tennessee's death penalty statute on the grounds that the application of the "heinous, atrocious, or cruel" circumstance did not constitutionally guide the sentencing jury's discretion. The court rejects that claim on the basis of Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

## IV. CONCLUSION

The court finds that the State of Tennessee violated Kenneth Wayne O'Guinn's fifth amendment privilege against self-incrimination and his sixth amendment right to the

effective assistance of counsel. Consequently, the court orders that the warden release Kenneth Wayne O'Guinn from custody ninety days from the entry of this order unless the State of Tennessee initiates a new trial of this matter. The court further orders that his release be stayed if the respondents in this action appeal the release order. If the Court of Appeals concludes that the State of Tennessee did not violate O'Guinn's privilege against self-incrimination, the court orders that the state conduct a new sentencing hearing to correct the violation of his sixth amendment right to the effective assistance of counsel.