IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 2000 Session

## State of Tennessee v. James Robert Ledford

**Direct Appeal from the Criminal Court for Bradley County**
**No. M98-088, R. Steven Bebb and Carroll L. Ross, Judges**

---

**No. E1999-00917-CCA-R3-CD - Decided**
**August 28, 2000**

---

A Bradley County jury found the appellant, James Robert Ledford, guilty of one count of conspiring to present a false insurance claim, presenting a false insurance claim, and arson of personal property. For these offenses, the appellant was sentenced to five years, with all but ninety days suspended.  In this appeal as of right, the appellant contends that (1) the trial court erred in denying suppression of his statement to the police which was obtained in violation of his constitutional rights and  (2)  the evidence is insufficient to support his conviction for conspiracy to present a false insurance claim. After review, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. and NORMA MCGEE OGLE, J., joined.

James F. Logan, Jr., Cleveland, Tennessee, for the appellant, James Robert Ledford.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Elizabeth B. Marney, Assistant Attorney General, Jerry N. Estes, District Attorney General, and Stephen D. Crump and Joseph Hoffer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The appellant, James Robert Ledford, was found guilty by a jury of one count of conspiring to present a false insurance claim, presenting a false insurance claim, and arson of personal property.[1]

---

[1]The appellant and a co-defendant, Samuel Ralph Mikel, were charged in a joint indictment with conspiracy to commit arson, aggravated arson of personal property, conspiracy to commit insurance fraud, and insurance fraud.  The
(continued...)

The Bradley County Criminal Court imposed a split confinement sentence of five years, with ninety days to be served in periodic confinement. The jury also imposed a monetary fine in the amount of $8,500. On appeal, the appellant contends that his statement to law enforcement officials should have been suppressed and that the evidence is insufficient to support his conviction for conspiracy to present a false insurance claim.

After review, we affirm.

## Background

On December 16, 1997, the appellant reported to law enforcement officials that his ski boat had been stolen. Soon thereafter, the appellant reported the claim to his insurance carrier.[2] The following day a grass fire was reported in Bradley County and the fire department responded.[3] The appellant's boat was found burning at the site of the reported grass fire. The odor of "kerosene or diesel fuel" was prevalent around the boat. The presence of a "kerosene range distillant" was later confirmed following forensic analysis of the fire debris. Investigators at the scene observed that "[t]he engine was missing. The only thing left was a few of the control cables and the wiring that ran to the boat, to the engine area."

On January 4, 1998, police officers conducted a search at the business/residence of co-defendant Mikel. During the search, officers discovered an engine and transmission on the ground beside the door. "The area was basically littered with boat parts." The transmission number and the engine serial numbers matched those of the boat registered in the appellant's name.

Detective Tony Alvarez participated in the search of Mikel's business. After the search, it was agreed that the appellant should be located to identify the boat parts. Detective Alvarez, accompanied by Sergeant Blackwell, contacted the appellant. The officers advised the appellant that they had located some boat parts that were believed to be from his boat and asked whether he could come to the Law Enforcement Operations Center (LEOC) to make a positive identification of these parts. Detective Alvarez testified that the appellant appeared elated, "[h]e was very happy and he said, 'Yeah definitely.'" The officers then asked the appellant "if he wanted to drive his vehicle down, if he wanted to follow us, or whether he wanted to ride with us." The appellant elected to ride with the officers. They then proceeded to LEOC.

---

[1](...continued)
aggravated arson charge was dismissed. The court later granted co-defendant Mikel's motion for a severance.

[2]Financial documents of the appellant were subpoenaed from First American Bank. The records revealed a loan for a 1990 Malibu Skier boat, which, as of January 1998, had a balance of $9,763.31.

[3]En route to the location, the fire truck ran off the road, resulting in the death of a volunteer firefighter.

Once at the LEOC, the appellant was met by Captain Burtt who directed the appellant to the office of Detective Alvarez. Alvarez's office was divided into two areas by a partition. Detective Alvarez had returned to his desk where he was completing some paperwork. On the other side of the partition, the appellant and Captain Burtt were seated at a conference table. At this time, Alvarez overheard Burtt advising the appellant of his Miranda rights and the appellant responding that he understood these rights. Alvarez also overheard the appellant explain that he was having financial problems. Notwithstanding this admission, the appellant denied having any involvement in the burning of the boat. Additionally, the appellant admitted to knowing Mr. Mikel but denied making "any type of arrangements or anything like that to have that boat stolen or to make it disappear or anything like that." Captain Burtt then left the room.

At this point, Alvarez looked over the divider and noticed the appellant slumped over. He inquired as to whether he was "okay" and observed that the appellant's eyes "were sort of watery." Alvarez inquired as to whether the appellant had been advised of his rights. The appellant responded that he had and that he understood those rights. Alvarez then began talking with the appellant and informed him that "if he had any involvement in the theft and arson of his boat that the best thing that he could do for himself was to come clean." He continued to advise the appellant that "if in fact he was involved and he had dug a hole for himself the only way would be up, and that by lying and trying to be deceitful about what happened would only create a bigger problem for him." The appellant then began posing hypotheticals to Alvarez regarding the theft of the boat. Alvarez then asked the appellant whether his hypotheticals were, in fact, reality. The appellant started crying and talking about his family. He then admitted that the hypothetical statements were indeed true. Alvarez asked the appellant if he would be willing to put in writing what he had just told him about his contact with Mikel. The appellant assented but asked if Alvarez could write the statement because "he was too nervous." The appellant then provided the following statement:

> I was advised of my constitutional rights and fully understood what they were. The statements I made to Lieutenant Alvarez were of my free will. No pressure or coercion of any kind was made to me or against me. The following statement is the whole truth and nothing but the truth as to the best of my ability.
>
> During the month of November 1997, I went over to Junior's (Sammy Ralph Mikel) shop on Howard Street. While there we had a few beers and at one point I casually talked to him about my boat and its financial burden. Junior then mentioned to me about making the boat disappear. I told him that if it does, whoever has it can keep what's in it. He just laughed. It was a casual conversation. I told him that if it anything happen I didn't want to know anything about. Once again, he just laughed. I then had another beer or two and then left. Since that time at his shop, I've had no contact with Junior until today when I was brought in to the Justice Center.
>
> On December 16, 1997, when I got home, I noticed that the boat was missing. I thought my mom had taken the boat to get it serviced. I was hoping that Junior had not taken the boat. When my mom got home, I asked her and she said no. At that time the thought of Junior taking the boat crossed my mind. I didn't call him or

-3-

attempted to get in contact him. At that time I called the Sheriff's Office and made a report of theft.

I called my Insurance Company . . . and reported the theft. They said they would send an agent.

On the same day I called the Insurance Company, an Officer Denney pulled up in my driveway and told me they believed they had found my boat. He told me where they had found it. The Insurance man pulled in which time we went to see the boat. When I got there the boat had already burned completely. I was able to see a few things which I was able to identify. The boat trailer had already been towed prior to my arrival.

The Insurance man gave me some forms to fill out and have notarized. I was to send it in which I did on Friday, January 2, 1998.

I have no knowledge of who else was with Junior at the time of the theft and burning of my boat.

I never gave him any money. His payment was whatever he could strip from the boat.

The appellant confirmed and signed the transcribed statement. Detective Alvarez testified that no threats or intimidations were made or used towards the appellant at any time during the interview.[4]

Based upon this proof, the jury found the appellant guilty of conspiring to present a false insurance claim, arson, and presenting a false insurance claim.

## I. Motion to Suppress

Prior to trial, the appellant filed a motion to suppress his written statement provided to police. A hearing on the motion to suppress was held on August 31, 1998, at which the following proof was developed.

**Appellant's Testimony**:
The appellant testified that he is twenty-seven years old and was employed in the home improvement/contracting business. On December 16, 1997, the appellant returned to his residence

---

[4] Detective Alvarez admitted that he overheard Captain Burtt tell the appellant, "He's [Mikel] is giving you up." It was undisputed throughout the course of the proceedings that Mikel never provided such a statement to law enforcement.

and discovered his boat was missing. He then notified law enforcement officers. The next morning, he was informed that his boat had been found burning off the side of a road.

On January 4, 1998, the appellant was working at a job site when he was approached by law enforcement officers. Detectives Alvarez and Blackwell asked the appellant if he could "come and identify some boat parts that they had found." The appellant agreed to do so. The appellant asked the officers if he should drive his own vehicle; Detective Alvarez told the appellant to "just ride with us." Upon arriving at the detective's office, the appellant noticed that there were not any boat parts present for him to examine. However, Detective Bill Burtt was present. Detective Burtt took the appellant by the arm and escorted him to a building where Burtt "pointed out" the co-defendant, Mikel. Burtt then directed the appellant to a house next to the building. Inside the house, Detective Burtt led the appellant to an interview room.

Inside this room, Detective Burtt advised the appellant that "the gig was up," relaying information that "Mr. Mikel and also another person, and possibly another has indicated that you were in on the theft and burning of your boat." The appellant denied any such involvement and stated that he had no knowledge as to Mr. Mikel's involvement. Detective Burtt became irritated and "slapped the table." He informed the appellant that he was not cooperating and advised the appellant that "they know" of the appellant's financial situation. The appellant testified that he "made a comment about maybe needing to speak to a lawyer." Burtt responded, "It's now or never. Once you walk out that door, you can't turn back." Burtt continued, "If you go out the door, you can't come back." You're going to jail regardless. If you walk out that door, you're not coming back in here. There's no turning back." Burtt then left the interview room.

Detective Alvarez then approached the appellant and began discussing the appellant's wife and family. The appellant testified that he asked Detective Alvarez about the possible punishment for the arson which had resulted in the death of the fireman. Alvarez responded ". . . aggravated arson and it means that you . . . go to jail for a long time." Alvarez advised the appellant that if he "would cooperate, he would try to drop that charge to just arson." Alvarez continued to discuss the appellant's family, the death of the fireman, and possible charges and punishments. Throughout this discussion, the appellant continued to deny any involvement. The appellant testified that, at some point, he informed Alvarez, "I don't want to talk about it anymore." Nonetheless, the appellant finally agreed to give a statement which was transcribed by Detective Alvarez. The appellant also stated that he signed a waiver of rights form after making his statement.

**Detective Alvarez's Testimony:**

Detective Alvarez testified that after picking up the appellant at his place of work, the officers told the appellant that he could ride with them or he could take his own car to the Law Enforcement Operations Center. The appellant elected to ride with the officers. Arriving at the station, Captain Burtt escorted the appellant into the office of Detective Alvarez. Although Detective Alvarez was not involved in the conversation between Burtt and the appellant, he overheard Captain Burtt inform

the appellant that he had been implicated in the theft and the arson. At this point, the appellant denied any involvement in the offenses.

After Burtt left the room, Alvarez talked with the appellant about his family. Alvarez advised the appellant that if he cooperated in the investigation, the District Attorney and the court would be advised of his cooperation. No other promises were made to the appellant. The appellant asked Alvarez about the possibility of charges resulting from the death of the firefighter. Alvarez informed the appellant that, in his opinion, he could not be charged with aggravated arson because of the death, however, the District Attorney would make the ultimate determination regarding the nature of the charges. Detective Alvarez testified that the appellant never indicated that he did not want to give a statement, never indicated that he wanted a lawyer, and never indicated that he felt uncomfortable talking with Alvarez. Captain Burtt did not testify at the hearing.[5]

Based upon this proof, the trial court denied the appellant's motion to suppress finding the statement to be voluntary. The appellant now challenges the trial court's ruling and the admissibility of the statement. Precisely, he argues (1) the "seizure" of his person by police officers at his place of business and his subsequent transportation to the Law Enforcement Operations Center was involuntary and illegal, therefore, any subsequent statement made by the appellant must be suppressed; (2) that his statement was obtained absent the advice of Miranda warnings; (3) the interrogators failed to heed the appellant's assertion of his right to counsel and his right to remain silent; and (4) the statement was the result of coercion, threats, and promises of leniency and, therefore, is not voluntary.

In reviewing the denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the State as the prevailing party. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. Daniel, 12 S.W.3d at 423. Indeed, these findings will be upheld unless the evidence preponderates otherwise. Id. Furthermore, this court may consider the entire record, including the evidence submitted both at the suppression hearing and at trial, in evaluating the correctness of the trial court's ruling. State v. Henning, 975 S.W.2d 290, 297 (Tenn.1998). Although deference is given to the trial court's findings of fact, this court conducts its own appraisal of the constitutional questions presented by reviewing the law and applying it to the specific facts of the particular case. Id. (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997); Beare v. Tennessee Dept. of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993)).

In the present case, the trial court made the following findings:

---

[5]Neither was Captain Burtt called as a witness at trial.

. . .[T]he statement of the defendant . . . counsel earlier raised some question about the difference between the time the original waiver was signed and the time the statement was given. We don't have a – I don't think we show a time on his waiver. We show a date. But the statement in exhibit two reads, signed by James R Ledford and each paragraph initialed, 'I was advised of my constitutional rights and fully understood what they were.' Initialed by the defendant. 'The statements I made to Lieutenant Alvarez were of my free will. No pressure or coercion of any kind was made to me or against me. . .' And I might add . . . the defendant Mikel clearly refused to sign anything or give any kind of statement, and his statement indicates that. And there's been talk about . . . police officers making certain statements about having a statement from co-defendant Mikel. You know, the law's clear; they're permitted to do that. I mean, you can in fact trick a defendant . . . . That's the old Mutt and Jeff routine, good guy, bad guy kind of approach, which I presume every officer is taught at every training school they go to. So there's nothing in those things that would rule an otherwise valid confession invalid. Defendant alleges that there were certain promises made, but his statement says that there was no pressure or coercion of any kind used. . . .

And it's admitted by the police officer that they made a specific promise guaranteeing a lighter sentence and preferential treatment. The officers do not admit that in the testimony that I've heard. There was some statements that they, they didn't think they could charge him with a felony murder . . . . That was brought up. . . . Based upon the proof here today . . . the Court's just not willing to rule this statement invalid, based upon the proof I've heard.

In concluding that the appellant's statement was voluntarily made, the trial court's findings of fact are, at best, meager. Indeed, the trial court found the inculpatory statement to be voluntary because the statement contained language to that effect. The trial court neglected to make any factual findings as to the specific issues raised by the appellant at the suppression hearing, *i.e.*, (1) the legality of the appellant's initial seizure, (2) the invocation of counsel and/or the right to remain silent, and (3) the admonition of <u>Miranda</u> warnings preceding custodial interrogation.

The evidence presented in support of motions to suppress are generally determined by the facts and circumstances surrounding the challenged event. In other words, such issues are factually driven. Where resolution of factual issues are central to the determinations made by the trial court, Tenn.R.Crim.P. 12(e) requires the trial court to state its essential findings on the record. This court lacks the jurisdiction to find facts, determine credibility, or weigh the evidence. Tenn.Code Ann. § 16-5-108 (1994). Thus, we are constrained in reviewing, *de novo*, the application of the law to the facts, while we accredit the ruling of the trial court, if such ruling is supported by the evidence. <u>See</u> <u>State v. Bridges</u>, 963 S.W.2d 487, 490 (Tenn.1997). <u>See also</u> <u>Ornelas v. United States</u>, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663 (1996) ("a reviewing court should take care both to review findings of historical fact only for clear error and to give due

weight to inferences drawn from those facts by resident judges...."). If the trial court's findings of fact are not precise and cannot be substantially supplemented by the record, an appellate court is prevented from completing any meaningful review of the law applicable to those pertinent facts. However, we find that the evidence introduced at the suppression hearing and at the subsequent trial relative to the issues now before us were sufficiently developed to permit review of the issues raised on appeal.[6] Accordingly, we proceed with a *de novo* review of the law applicable to the facts viewed in the light most favorable to the State.

## A. Seizure of the Appellant

Although not explicitly raised in his brief, it appears that the appellant presents the corollary argument that, since his transportation to the LEOC by the police officers was involuntary and illegal, any subsequent statement made by the appellant must be suppressed as a result of the taint of the initial seizure.[7] Specifically, the appellant maintains that, on January 4th, law enforcement officers took him into custody at his place of work without any process or any evidence against him. Again, the trial court did not make a specific findings as to this issue, although the court did imply that the appellant was not "seized" when the officers first requested the appellant to accompany them to the LEOC.

The Fourth Amendment to the United States Constitution provides that the people shall "be secure in their persons . . . against unreasonable searches and seizures. . . ." U.S. CONST. amend. IV; cf. TENN. CONST. art. I, § 7. This constitutional protection is most often implicated when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen. See Daniel, 12 S.W.3d at 424 (citing 4 WAYNE R. LAFAVE, *Search & Seizure, § 9.3* (3d ed. 1996 & Supp. 1999). "While arrests and investigatory detentions implicate varying degrees of constitutional protection, "not all personal intercourse between policeman and citizens involves 'seizures' of persons." Id. (citing Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16 (1968)). Indeed, even when police have no basis for suspecting that an individual has committed . . . a crime, the officer may approach an individual in a public place and ask questions without implicating constitutional protections. Daniel, 12 S.W.3d at 425 (citations omitted). A person is "seized" in violation of his or her constitutional rights, if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Daniel, 12 S.W.3d at 425 (citations omitted); see also United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980); State v. Bragan, 920 S.W.2d 227, 243 (Tenn. Crim. App. 1995). In the absence of circumstances indicating a seizure, such as the display of a weapon by an officer or the use of coercive

---

[6]We note, however, that had the record not been sufficient regarding the constitutional issues before us, it would be necessary to remand the case to the trial level for entry of findings of fact.

[7]The appellant's argument is based on the "fruit of the poisonous tree" theory, wherein, the State cannot rely on a legally obtained statement if the appellant's initial detention or seizure was unlawful. See Daniel, 12 S.W.3d at 428 (citing Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417 (1963)).

language, no "seizure" under the Fourth Amendment has occurred. See Bragan, 920 S.W.2d at 243 (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877).

In the present case, law enforcement officers approached the appellant, the recent self-reported victim of an alleged theft, requesting that he accompany the officers to the LEOC for the purpose of identifying items believed to be from his boat. Thus, the question is whether the appellant's consent to accompany the officers was voluntarily given or was the product of duress or coercion, express or implied. See Bragan, 920 S.W.2d at 243; State v. Joseph Martin Thurman, No. 01C01-9706-CC-00231 (Tenn. Crim. App. at Nashville, Mar. 31, 1999), perm. to appeal denied, (Tenn. Oct. 4, 1999). Relevant factors in making this determination include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen. Daniel, 12 S.W.3d at 425-426 (citations omitted). The subjective beliefs of law enforcement officers regarding the suspect's culpability are irrelevant to the determination of custody. State v. Bush, 942 S.W.2d 489, 499 (Tenn.), cert, denied, 522 U.S. 953, 118 S.Ct. 376 ( 1997).

The proof reveals that the appellant agreed to accompany the officers and asked the officers if he needed to drive his own vehicle. The officers responded that the appellant could drive his own vehicle or he could ride with them. The appellant elected to ride with the officers. Once at the LEOC, Captain Burtt "escorted the appellant to a block building, "point[ing] out Mr. Mikels [sic]" and then escorted the appellant to the house beside the building. The appellant then was directed to an interview room where Captain Burtt confronted the appellant with information that he had been implicated in the theft and arson. The appellant was then informed of his Miranda rights.

From the appellant's testimony and the testimony of the officers, we conclude that the officers' initial conduct with the appellant at his place of business and their request that he accompany them to LEOC would not have communicated to the reasonable person that he or she was not free to leave. The initial encounter was not accompanied by physical force or a show of authority sufficient to constitute a seizure. Rather, the record overwhelmingly demonstrates that the appellant voluntarily accompanied the officers to LEOC. Thus, the appellant was not "illegally seized" under the Fourth Amendment.[8]  This issue is without merit.

---

[8]However, once Captain Burtt informed the appellant that he had been implicated in the crime, he was in custody within the meaning of Miranda and, accordingly, was advised of his constitutional rights. A person is in custody if there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." See Bush, 942 S.W.2d at 499 (Tenn) (citing Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529 (1994)). Specifically, the inquiry is "how a reasonable person in the suspect's position would have understood his position," i.e., would he have felt that he was not free to leave and, thus, in custody. Id. (citing Berkemer v. McCarty, 468 U.S. at 422, 104 S.Ct. at 3151; see also Stansbury, 511 U.S. at 323, 114 S.Ct. at 1529).

## B.  Failure to provide <u>Miranda</u> Warnings

The privilege against self-incrimination prohibits the State from compelling an individual to incriminate himself.  U.S. CONST. amend. V.  <u>See generally</u> <u>Estelle v. Smith</u>, 451 U.S. 454, 462-463, 101 S.Ct. 1866, 1872-1873 (1981).  A defendant must be provided warnings about the exercise of his constitutional rights whenever he is subjected to "custodial interrogation."  <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 434, 104 S.Ct. 3138, 3147 (1984); <u>United States v. Murphy</u>, 107 F.3d 1199, 1204 (6th Cir. 1997) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966)).  Absent such procedural safeguards, any statement subsequently provided is not admissible at trial.  <u>Miranda</u>, 384 U.S. at 477-478, 86 S.Ct. at 1629-1630.  Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under <u>Miranda</u>.  <u>Oregon v. Elstad</u>, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292 (1985).

The trial court found that, despite the appellant's assertions that he was not provided his <u>Miranda</u> rights, the appellant was advised of his rights prior to making his statement.  During the appellant's trial, Detective Alvarez testified that he overheard Captain Burtt advise the appellant of his <u>Miranda</u> rights.  Likewise, Detective Alvarez, prior to his conversation with the appellant, asked the appellant if he had been advised of his rights and whether he understood those rights.  The appellant responded affirmatively.  We cannot conclude that the evidence preponderates against the trial court's determination.  This challenge is without merit.

## C.  Invocation of Rights

The appellant next asserts that, during the course of his interrogation by Captain Burtt, he commented about "maybe needing to speak to a lawyer."  Captain Burtt responded, "It's now or never.  Once you walk out that door, you can't turn back."  Burtt then left the interview room.  The appellant was never provided counsel.  After being approached by Detective Alvarez, the appellant stated that, at some point, he informed Alvarez "I don't want to talk about it anymore."  According to the appellant, Alvarez ignored this statement and continued questioning the appellant.  Contrary to these allegations, Detective Alvarez  testified that the appellant never indicated that he did not want to give a statement, that he wanted a lawyer or that he felt

uncomfortable talking with Alvarez.[9] The trial court failed to make explicit findings of fact as to these issues.

## 1. Right to Counsel under *Miranda*

The Fifth Amendment right to counsel attaches during custodial interrogation. Edwards v. Arizona, 451 U.S. 477, 481-82, 101 S.Ct.1880 (1981). If a defendant requests counsel while being given his Miranda warnings or during custodial interrogation, the interrogation must cease. Edwards v. Arizona, 451 U.S. at 482, 101 S.Ct. at 1883; Miranda v. Arizona, 384 U.S. at 444-45, 86 S.Ct. at 1612; State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). Any subsequent statement made by a defendant as a result of police-initiated interrogation must be suppressed. Edwards v. Arizona, 451 U.S. at 477, 101 S.Ct. at 1880.

Although there is no bright-line rule concerning when an accused invokes the right to counsel, the United States Supreme Court has held that an accused must articulate his desire to have counsel present unambiguously and sufficiently clearly so that a reasonable police officer in the circumstances would understand the statement to be a request for counsel. See Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355 (1994); Huddleston, 924 S.W.2d at 669. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. Davis v. United States, 512 U.S. at 460, 114 S.Ct. at 2356. An equivocal or ambiguous request for counsel does not trigger the Edwards requirement under the Fifth Amendment. Davis v. United States, 512 U.S. at 452, 114 S.Ct. at 2350; Huddleston, 924 S.W.2d at 669-70. In other words, "[u]nless the suspect actually requests an attorney, questioning may continue." Davis, 512 U.S. at 462, 114 S.Ct. at 2357. In order to unequivocally invoke one's right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney." Huddleston, 924 S.W.2d at 669-70 (emphasis added).

The determination whether the appellant made a request for an attorney, equivocal or unequivocal, is a question of fact for the trial court to determine. State v. Farmer, 927 S.W.2d 582, 594 (Tenn.Crim.App.1996). In the present case, the trial court neglected to enter such a

---

[9]At trial, the following colloquy occurred:

**GENERAL CRUMP:** . . . At any time did Mr. Ledford indicate to you that he didn't want to give you a statement? Did he ever —

**ALVAREZ:** No, he did not.

**GENERAL CRUMP:** Did he ever tell you he wanted to see a lawyer?

**ALVAREZ:** No, he did not.

**GENERAL CRUMP:** Did he ever tell you that he didn't feel comfortable talking about this with you?

**ALVAREZ:** No, he didn't.

**GENERAL CRUMP:** Did he ever tell you that what you'd put down on that piece of paper wasn't the truth?

**ALVAREZ:** He did not.

**GENERAL CRUMP:** Ever say he wasn't going to sign that because it wasn't true?

**ALVAREZ:** He did not.

**GENERAL CRUMP:** Did he ever act hesitantly about signing the waiver of the statement?

**ALVAREZ:** He did not.

finding. Regardless, the appellant's assertion, "Don't I need to talk to a lawyer?" does not suffice to invoke his right to counsel under Miranda. See, e.g., State v. James Clayton Young Jr., No. 01C01-9605-CC-00208 (Tenn. Crim. App. at Nashville, May 22, 1998) (defendant's statement "I'm sorry, I'm just wondering if I should have a lawyer" not unambiguous invocation of right to counsel); State v. John M. Ake, No. 01C01-9603-CC-00094 (Tenn. Crim. App. at Nashville, June 6, 1997), perm. to appeal denied, (Tenn. Mar. 9, 1998) (defendant's statement, "I probably need to get a lawyer, don't I?" not unambiguous invocation of right to counsel); State v. Jack Jay North, Jr., No. 02C01-0512-CC-00369 (Tenn. Crim. App. at Jackson, Dec. 12, 1996), perm. to appeal denied, (Tenn. Jul. 7, 1997) (defendant's question to detective whether he needed attorney held to be equivocal and not clear invocation of the right). The fact that the appellant failed to make an unambiguous request for counsel accompanied by his subsequent failure to invoke the right after being re-Mirandized by Detective Alvarez supports the conclusion that the appellant never invoked his right to counsel and, subsequently, voluntarily waived his right to counsel under Miranda.

## 2. Right against Self-Incrimination

When a suspect clearly articulates during custodial interrogation that he wishes to invoke the privilege against self-incrimination, the officers conducting the interrogation must stop questioning the suspect. See State v. Crump, 834 S.W.2d 265, 269 (Tenn.), cert. denied, 506 U.S. 905, 113 S.Ct. 298 (1992) (citing Miranda v. Arizona, 384 U.S. at 473-74, 86 S.Ct. at 1627).

The trial court failed to enter specific findings regarding the appellant's alleged invocation of his right against self-incrimination. Notwithstanding, the record preponderates against the appellant's allegation that he invoked his right to remain silent. Detective Alvarez was consistent in his testimony that the appellant never indicated that he did not want to provide a statement. This testimony is corroborated by the undisputed proof that the appellant questioned Detective Alvarez regarding the possible charges and penalties and continued to discuss the matter by using hypothetical scenarios. Accordingly, we cannot conclude that the appellant invoked his right to remain silent. This issue is without merit.

## D. Voluntariness of Statement

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. See Miranda v. Arizona, 384 U.S. at 467, 86 S.Ct. at 1624; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992), cert. dismissed, 510 U.S. 124, 114 S.Ct. 651 (1993). The appellant contends that, although there is a waiver of rights form signed by himself, neither the waiver nor the inculpatory statement was voluntarily entered as he was compelled to do so by coercive police tactics. Specifically, the appellant argues that, under the totality of the circumstances, including the officers' promises of leniency, the officers' use of

false evidence against him, threats that the appellant only had one opportunity to discuss the matter, and a lengthy interrogation, the statements should have been suppressed.

In order for a confession to be admissible, it must be "freely and voluntarily [made]; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532,542-43, 18 S.Ct. 183, 187 (1897)). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole.[10] Smith, 933 S.W.2d at 455. A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Id. (citations omitted). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary. . . ." Id. (citations omitted). The focus of the reviewing court should be "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined - a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."[11] State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. at 534, 81 S.Ct. at 739-41).

Although the appellant made allegations of coercion and intimidation by his interrogators, the trial court failed to accredit his claims. Instead, in finding the statement voluntary, the court relied upon the testimony of Detective Alvarez and the implied waiver contained in the appellant's inculpatory statement. Moreover, the record fails to establish that law enforcement exercised any compelling influence over the appellant or that his statements were induced by promises of leniency. Detective Alvarez testified that he responded "to the best of his knowledge" regarding the appellant's inquiries regarding possible charges and possible penalties. "[T]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary." Smith, 933 S.W.2d at 456 (quoting United States v. Pelton, 835 F.2d 1067. 1072-73 (4th Cir. 1987)). Furthermore, the record indicates that the appellant was advised fully and completely of his Miranda rights. At no time did the appellant indicate that he did not understand his rights. Although the appellant signed no explicit written waiver, a waiver properly may be inferred from the fact that appellant acknowledged understanding his rights and then gave a statement which he both initialed and signed. State v. Elrod, 721 S.W.2d 820, 823 (Tenn.Crim.App.1986). The trial court obviously accredited the

---

[10]Confessions may not be the product of coercions. "This is not because they are unlikely to be true, but rather, the methods employed to extract them offend an underlying principle that ours is an accusatorial system in which the State must establish guilt by evidence independently and freely secured and may not by coercion provide its charge against an accused out of his own mouth." See Rogers v. Richmond, 365 U.S. 534, 540-41, 81 S.Ct. 735, 739 (1961).

[11]The test for voluntariness in relation to police deception is whether based upon the totality of the circumstances, "the conduct of the law enforcement officers was such to undermine the accused's free will and critically impair his capacity for self-determination so as to bring about an involuntary confession." Crump, 834 S.W.2d at 271 (citing Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879 (1961); Kelly, 603 S.W.2d at 728)

-13-

testimony of Detective Alvarez in finding a valid and knowing waiver of rights and finding a voluntary statement made from the free will of the appellant.

As stated above, the trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the appellant can show that the evidence preponderates against the trial court's ruling. State v. O'Guinn, 709 S.W.2d 561, 566 (Tenn), cert. denied, 479 U.S. 871, 107 S.Ct. 244 (1986); see also State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). We find no reason to disregard the findings of the trial court with respect to the voluntariness of the defendant's statement. We conclude that the trial court's denial of the motion to suppress was proper.

## II. Sufficiency of the Evidence

In his final issue, the appellant contends that the evidence is insufficient to support his conviction for conspiring to present a false insurance claim as his statement fails to evidence any criminal intent on his behalf. Specifically, the appellant contends that there is "absolutely no proof of a prior agreement . . ." to support the theory of conspiracy.

Tenn.Code Ann. § 39-12-103 (1997) provides in pertinent part:
(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

(d) No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

"A conspiracy requires knowing involvement." State v. Shropshire, 874 S.W.2d 634, 641 (Tenn.Crim.App.1993). The conspiracy need not be manifested by formal words or an express agreement. Shropshire, 874 S.W.2d at 641; State v. Gaylor, 862 S.W.2d 546, 553 (Tenn.Crim.App.1992); State v. Cook, 749 S.W.2d 42, 44 (Tenn.Crim.App.1987). Moreover, the existence of the conspiracy may be established by circumstantial evidence and by the conduct of the parties in executing the object of their agreement. Shropshire, 874 S.W.2d at 641; Cook, 749 S.W.2d at 44; Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim .App. 1978).

The appellant provided a statement which related a conversation between the appellant and co-defendant Mikel one month prior to the offense. During this conversation, the appellant advised Mikel of his desire to "get rid" of his boat and that Mikel had discussed with him the possibility of making the "boat disappear." While isolated portions of the appellant's statement

could be interpreted as equivocal in the "promoti[on] or facilita[tion]" of the offense, the statement read as a whole and, in particular, the statement "His payment was whatever he could strip from the boat," was clearly unambiguous. Considering the contents of the discussion and corroborating proof introduced at trial, we conclude that the State presented sufficient evidence to permit a jury to find that the appellant and Mikel formed an agreement to commit insurance fraud. See, e.g., State v. Yasmond Fenderson, No. 03C01-9711-CR-00496 (Tenn. Crim. App. at Knoxville, Jan. 6, 1999), perm. to appeal denied, (Tenn. Jun. 14, 1999)(despite lack of direct proof, evidence of agreement between conspirators can be inferred from their acts).

The relevant question upon a sufficiency review of a criminal conviction, be it in the trial court or an appellate court, is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). See also Tenn. R. App. P. 13(e); Tenn. R. Crim. P. 29(a). Applying this standard to the facts of the present case, we conclude that the evidence is sufficient to establish the elements of conspiracy to commit insurance fraud. See Tenn. Code Ann. § 39-14-133 (1997); Tenn. Code Ann. § 39-12-103.

After review, we affirm the judgment of the trial court.

_____
DAVID G. HAYES, JUDGE

-15-